Lindsey M. Romano (SBN: 337600)
Kendra N. Stark (SBN: 363663)
Bailey M. Frank (*Pro Hac Vice*)
Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 875-4126
Facsimile: (415) 986-8054
Email: lromano@grsm.com
kstark@grsm.com
bfrank@grsm.com

***Attorneys for Defendants***
***CALIFORNIA FORENSIC MEDICAL GROUP, INC., RAJENDRA MAHAJAN, SUMEET CHAGGER, and HARKAMALJIT HUNDAL***



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF JESUS ERIC MAGANA, J. JESUS MAGANA DUARTE, and VERONICA DUARTE VACA,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF ALAMEDA, ALAMEDA COUNTY SHERIFF'S OFFICE, YESENIA SANCHEZ, ERIK BAKER, ZACHARY TSANGLEE, PETER CANDELARIO, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC & WELLPATH MANAGEMENT, INC., also known as WELLPATH LIQUIDATING TRUST, a nominal party, RAJENDRA MAHAJAN, SUMEET CHAGGER, HARKAMALJIT HUNDAL, and DOE 1 to 20,<br><br>Defendants. | CASE NO. 3:24-cv-04716-JD<br><br>**CFMG DEFENDANTS' NOTICE OF MOTION, MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF MICHAEL T. PUERINI, M.D., AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: October 15, 2026<br>Judge: Honorable James Donato |

**TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on October 15, 2026, at 11:00 am PST, or as soon thereafter as the matter may be heard, in the above-entitled Court, Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., RAJENDRA MAHAJAN, SUMEET CHAGGER, and HARKAMALJIT HUNDAL (collectively, “CFMG Defendants”), respectfully will and hereby do move the Court for an order excluding the opinions and testimony of Plaintiffs’ retained expert

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

Michael T. Puerini, M.D., in their entirety, for failure to satisfy the reliability, relevance, and admissibility requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and Federal Rules of Evidence 702, 704, and 403.

This Motion will be made on the grounds that:

1. Dr. Puerini's opinions were formed without reviewing the core factual record, including the depositions of the medical providers he criticizes, substantial additional records produced during discovery, and the complete video evidence on which many of his opinions are based.

2. Dr. Puerini's opinions rely in significant part upon a chronology prepared by Plaintiffs' counsel rather than an independently developed factual analysis, and he admitted his own understanding of the timeline was "vague."

3. Dr. Puerini's opinions are not the product of any articulated, reliable, or testable methodology, are not based on any identified current standard of care, and instead rest upon subjective impressions, assumptions, and speculation.

4. Dr. Puerini's causation opinions, including his opinions that Mr. Magana "would more likely than not have survived" had different care been provided, are unsupported *ipse dixit* conclusions that lack any reliable scientific or medical foundation.

5. Dr. Puerini's opinions regarding the amount of water allegedly consumed by Mr. Magana and his opinions regarding Mr. Magana's alleged level of consciousness are speculative and unsupported by sufficient facts or data.

6. Dr. Puerini's opinions that Defendants acted with "deliberate indifference," engaged in "criminal behavior," or otherwise satisfied legal standards applicable to Plaintiffs' claims are impermissible legal conclusions and invade the province of the jury.

7. Dr. Puerini's opinions concerning jail funding, institutional conditions, and generalized criticisms of Santa Rita Jail do not fit the issues presented in this case and will not assist the trier of fact.

8. Dr. Puerini's inflammatory and prejudicial rhetoric, including characterizations of the care at issue as a "death sentence," "deplorable," "criminal," and "deliberately indifferent," should be excluded under Rule 403.

Accordingly, CFMG Defendants seek exclusion of Dr. Puerini's report, all forty-seven numbered opinions contained therein, and any testimony derived from or based upon those opinions. In the alternative, CFMG Defendants request exclusion of the categories of opinions identified in this Motion, including his causation opinions, water-volume opinions, consciousness opinions, legal-conclusion testimony, systemic jail-condition opinions, and inflammatory characterizations.

In support of this Motion, CFMG Defendants rely upon and incorporate by reference this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action as reflected in the Court's docket, and any oral and documentary evidence presented at the hearing on this Motion.

Dated: August 31, 2026 GORDON REES SCULLY MANSUKHANI, LLP

By: */s/ Kendra N. Stark*
Lindsey M. Romano
Kendra N. Stark
Bailey M. Frank
***Attorneys for Defendants***
***CALIFORNIA FORENSIC MEDICAL GROUP. INC., RAJENDRA MAHAJAN, SUMEET CHAGGER, and HARKAMALJIT HUNDAL***

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. STANDARD OF REVIEW .......... 1

III. ARGUMENT .......... 2

I. Dr. Puerini's Opinions Rest on an Insufficient Factual Foundation and Must Be Excluded Under Rule 702(b). .......... 2

A. Dr. Puerini Formed His Opinions Without Reviewing the Relevant Case Record. .......... 3

B. The Factual Basis for Dr. Puerini's Opinion was a Chronology Drafted by Plaintiffs' Counsel, Not the Evidentiary Record. .......... 5

II. Dr. Puerini's Opinions Are Not the Product of Any Reliable Methodology and Must Be Excluded Under Rule 702(c)-(d). .......... 7

A. Dr. Puerini Applied No Articulated, Testable Methodology. .......... 7

B. Dr. Puerini's Causation Opinions Are *Ipse Dixit* With Too Great an Analytical Gap. .......... 10

III. Dr. Puerini's Legal Conclusions and Opinions Must Be Excluded Under Rules 704 and 702(a). .......... 12

A. Dr. Puerini's "Deliberate Indifference" and "Criminal Behavior" Opinions Are Impermissible Legal Conclusions. .......... 12

B. Dr. Puerini's Systemic Jail-Conditions and Funding Opinions Do Not Fit the Issues in Dispute. .......... 13

IV. Dr. Puerini's Inflammatory Rhetoric Should Be Excluded Under Rule 403. .......... 14

CONCLUSION .......... 15

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buck v. Davis*,
580 U.S. 100 (2017) .......... 25

*Clausen v. M/V NEW CARISSA*,
339 F.3d 1049 (9th Cir. 2003) .......... 21

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... 8, 17, 24

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) .......... 10

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) .......... 9, 10, 16

*Est. of Perez v. Morgan Cnty. Sheriff*,
No. 116CV00645SEBDLP, 2018 WL 4590967 (S.D. Ind. Sept. 25, 2018) .......... 23

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .......... 9, 21, 23

*Hall v. Baxter Healthcare Corp.*,
947 F. Supp. 1387 (D. Or. 1996) .......... 24

*In re Hanford Nuclear Rsrv. Litig.*,
534 F.3d 986 (9th Cir. 2008) .......... 9, 25

*Jinro Am. Inc. v. Secure Invs., Inc.*,
266 F.3d 993 (9th Cir. 2001) .......... 25, 26

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 8, 17

*Melton v. Cnty. of Maricopa*,
No. CV-21-00134-PHX-DWL, 2025 WL 2896092 (D. Ariz. Sept. 29, 2025) .......... 23

*Moore v. Naphcare, Inc.*,
No. 2:22-CV-0256-TOR, 2025 WL 1348921 (E.D. Wash. May 8, 2025) .......... 14, 16

*Moussouris v. Microsoft Corp.*,
311 F. Supp. 3d 1223 (W.D. Wash. 2018) .......... 14

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

*Neal-Lomax v. Las Vegas Metro. Police Dep't*,
574 F. Supp. 2d 1193 (D. Nev. 2008) ........ 17, 22

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ........ 9

*Rogers v. Raymark Indus., Inc.*,
922 F.2d 1426 (9th Cir. 1991) ........ 25

*Thomas v. Sheahan*,
514 F. Supp. 2d 1083 (N.D. Ill. 2007) ........ 23

*United States v. Amaral*,
488 F.2d 1148 (9th Cir. 1973) ........ 25

*United States v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020) ........ 16, 17

*Wiles v. Dep't of Educ.*,
No. CIV 04-00442 ACK-BMK, 2008 WL 4225846 (D. Haw. Sept. 11, 2008) ........ 23

**Statutes**

42 U.S.C. § 1983 ........ 7

**Rules**

Fed. R. Evid. 403 ........ 8, 9, 25, 26

Fed. R. Evid. 702 ........ *passim*

Fed. R. Evid. 702(a) ........ 8, 23

Fed. R. Evid. 702(b) ........ 9, 10, 13

Fed. R. Evid. 702(c)-(d) ........ 9, 16, 20

Fed. R. Evid. 704 ........ *passim*

Fed. R. Evid. 704(a) ........ 9

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

## I. INTRODUCTION

This Section 1983 action arises from the death of Jesus Eric Magana while housed at Santa Rita Jail on April 27, 2023. In support of their claims against California Forensic Medical Group, Inc., Dr. Rajendra Mahajan, Sumeet Chagger, and Harkamaljit Hundal, Plaintiffs rely on the opinions of retained expert Michael T. Puerini, M.D. Dr. Puerini's Expert Report, dated June 28, 2026, is attached as Exhibit A, and relevant excerpts of his July 30, 2026 deposition transcript are attached as Exhibit B.

Dr. Puerini's opinions should be excluded on four independent grounds. First, his opinions rest on an admittedly incomplete factual record and so fail Rule 702(b). Second, they are the product of no reliable methodology, no identified standard of care, and a series of speculative leaps that fail Rule 702(c)-(d). Third, his opinions that the medical defendants were "deliberately indifferent" are impermissible legal conclusions, and his opinions about jail funding and conditions do not fit the medical issues in dispute. Fourth, his inflammatory characterizations should be excluded under Rule 403. Each ground is sufficient on its own; together they warrant excluding his testimony in its entirety under Rules 702, 704, and 403.

## II. STANDARD OF REVIEW

Federal Rule of Evidence 702 charges the trial court with a gatekeeping obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The focus of that inquiry is on the expert's principles and methodology, not merely the conclusions they generate. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579. The gatekeeping duty extends to all expert testimony, including experience-based medical opinion, and requires that the expert "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In the Ninth Circuit, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology," which must rest on established principles reliably applied to the facts. *Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010).

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

The proponent of the testimony bears the burden of establishing admissibility, and the burden rests with Plaintiffs here. Since the December 1, 2023, amendment to Rule 702, the proponent must demonstrate each admissibility requirement by a preponderance of the evidence, Fed. R. Evid. 702, and the Ninth Circuit has confirmed that "there is no presumption in favor of admission." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025). A court need not admit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and it may exclude testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137, 146 (1997).

Moreover, although Rule 704(a) permits an expert to opine on an ultimate factual issue, an expert may not offer an opinion on an ultimate issue of law. Fed. R. Evid. 704. And Rule 403 permits the exclusion of testimony whose probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury — discretion that is "especially" broad "with respect to expert witnesses." *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008).

## III. <u>ARGUMENT</u>

### I. Dr. Puerini's Opinions Rest on an Insufficient Factual Foundation and Must Be Excluded Under Rule 702(b).

Rule 702 permits an expert to testify only if "the proponent demonstrates to the court that it is more likely than not that" the proponent satisfies each admissibility requirement, including Rule 702(b). Fed. R. Evid. 702. Rule 702(b)'s requirement that an opinion be "based on sufficient facts or data" is not a mere formality that an expert witness may satisfy by invoking his experience. It asks whether this expert, *on this record*, had a sufficient factual basis for the conclusions he drew. *Engilis*, 151 F.4th 1040; *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). (quoting Damon v. Sun Co., 87 F.3d 1467, 1475 (1st Cir. 1996)). Dr. Puerini did not. He criticizes the care rendered by Dr. Mahajan and the nurses without reviewing the depositions of those providers, the facility's governing medical policies, the additional records produced to him, or the full incident videos he claims to have relied upon.

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

**A. Dr. Puerini Formed His Opinions Without Reviewing the Relevant Case Record.**

Dr. Puerini's report and opinions do not meet the standard of Rule 702(b). His report expressly admits that it is merely "a brief summary of Mr. Magana's care and my preliminary opinions" based on "a brief review of some of the information provided." (Ex. A at 1, 13). Yet his deposition testimony establishes that he deliberately chose not to review significant portions of the available record before offering opinions regarding the conduct of healthcare staff. Most notably, Dr. Puerini admitted that after his initial review, he received "a very large set of files" containing additional materials but consciously declined to review them: "I received a file, a very large set of files, on a zip drive, and it was clear that there were additional files. I didn't review those. I reviewed what I reviewed initially for my draft report." (Ex. B, 16:21-24). He further admitted that he did not review any depositions of the medical providers whose conduct he criticizes throughout his report. (Ex. B, 18:23-25). He also admitted that the timeline included in his report was not created by him at all but was instead prepared by plaintiffs' counsel. (Ex. B, 21:3-13).

The troubling consequences of Dr. Puerini's incomplete record review became apparent during his deposition. In his report, Dr. Puerini opined that Nurse Hundal's chart entry documenting that Mr. Magana was found unresponsive at 15:25 was "patently false." However, Dr. Puerini admitted that he did not even know which nurse authored the note and was unaware that two different nurses were involved in Mr. Magana's care. (Ex. B, 106:13-21). When defense counsel explained that Nurse Hundal was not the nurse who evaluated Mr. Magana earlier in the day and did not even begin her shift until around 3:05 p.m., Dr. Puerini immediately retreated from his criticism, testifying that "[i]t changes the opinion that implies that she was putting a falsehood in her note." (Ex. B, 107:16-19). Indeed, he expressly conceded that "it takes away the falsehood in the record." (Ex. B, 107:21), "[t]he word 'false' may be overstated," (Ex. B, 110:12-13) and that "[f]alse implies that there was wrongdoing on the part of the nurse, that she said something intentionally -- a lie -- or -- or something like that. And I don't mean to imply that." (Ex. B, 110:17-21). Thus, once Dr. Puerini was presented with basic facts available in the record, one of his principal criticisms evaporated.

The same pattern appears elsewhere in his report. Opinion No. 19 states that "[n]o additional monitoring, diagnostic testing, or treatment was prescribed" by Dr. Mahajan. (Ex. A, at 10). When shown Dr. Mahajan's assessment and plan documenting administration of Zofran, hydration instructions, medication discussion, and observation orders, Dr. Puerini acknowledged that his report was not literally accurate. He ultimately conceded that the more accurate statement was that "[n]o *appropriate* or useful treatment was prescribed," and admitted that this was "different than no treatment was prescribed." (Ex. B, 43:20-24) (emphasis added). Thus, another absolute statement in the report was replaced with a significantly narrower criticism during deposition when confronted with the factual record.

The same unreliability permeates Dr. Puerini's video-based opinions. Despite repeatedly relying on what the videos supposedly depict in his report, Dr. Puerini admitted in his deposition that he did not actually watch all of the available footage before reaching his conclusions. (Ex. B, 17:10-14). Rather than suggesting any limitation imposed by time, access, or logistics, Dr. Puerini testified that limiting his review was a deliberate choice because he "didn't want to waste a lot of time," and "wanted to keep it cost-effective." He further volunteered, "I'm expensive. I'm very aware of that." (Ex. B, 17:22-23). Finally, Dr. Puerini admitted in his deposition that, for the limited video he did actually view, he could not identify *what* footage he watched. (Ex. B, 17:15-19).

This selective approach to the factual record is especially problematic because many of Dr. Puerini's most significant opinions are purportedly derived from the videos themselves. For example, he testified that he personally counted Mr. Magana consuming "at least 15 cups" of water on video and remembered "specifically" reviewing the footage multiple times in order to count both the cups consumed and the timing of consumption. (Ex. B, 24:2-4; 24:14-21). He then used this purported observation as the foundation for multiple standard-of-care opinions, repeatedly asserting that Mr. Magana drank fifteen to twenty glasses of water in approximately three minutes. (Ex. B, 23:21-24; 25:17-21; 52:14-20). Yet none of the videos produced in this litigation depict Mr. Magana consuming fifteen glasses of water on video in the manner claimed by Dr. Puerini. Moreover, when questioned about the cups he purportedly individually counted, Dr. Puerini

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

admitted that he could not say how large they were, testifying only that they "[m]ight have been eight ounce[s]." (Ex. B, 24:5-6). He further conceded that he did not even remember what the cups looked like. (Ex. B, 24:7-8).

Opinion No. 21 is particularly problematic because it is framed as a conclusion drawn from "all videos reviewed," (Ex. A at 10), yet during his deposition, Dr. Puerini acknowledged that he did not review all of the available video footage. (Ex. B, 17:10-13). He further explained that he "didn't want to waste a lot of time," "wanted to keep it cost-effective," and ultimately conceded that he "can't tell you what [he] reviewed." (Ex. B, 17:15-19). Moreover, the opinion is undermined by Dr. Puerini's later deposition testimony, where he acknowledged that Mr. Magana's presentation was consistent with descriptions contained in the mental health records. (Ex. B, 47:15-20).

In short, Dr. Puerini admittedly declined to review a substantial portion of the documentary record, failed to review any depositions of the medical providers whose conduct he criticizes, reviewed only portions of the available video evidence, and withdrew key opinions when confronted with facts contained in materials he chose not to review. Rule 702(b) requires "sufficient facts or data." Dr. Puerini's opinions are instead the product of a selective and incomplete review of the record, leaving far too great an analytical gap between the information he reviewed and the opinions he offers. Accordingly, his standard-of-care opinions should be excluded based on his incomplete and inconsistent understanding of the factual record.

### B. The Factual Basis for Dr. Puerini's Opinion was a Chronology Drafted by Plaintiffs' Counsel, Not the Evidentiary Record.

The factual narrative underlying Dr. Puerini's opinions compounds the same deficiency and concern for unreliability, because the chronology anchoring his report was drafted by plaintiffs' counsel rather than developed by the expert. (Ex. B, 21:3-13). Courts scrutinize the reliability of a factual predicate that counsel assembled. In *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223 (W.D. Wash. 2018), the court recognized that "the fact that some of the files were selected by defense counsel could suggest that 'the selection of which [files] were analyzed was subject to bias,'" *Id.* at 1245 (quoting *Chen–Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 124 (S.D.N.Y. 2015)). The opinion became inadmissible when counsel's involvement combined with

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

the expert's failure to "take any additional steps to check or ensure that it is representative." *Id.* Applying these principles in a jail medical-care case, the court in *Moore v. Naphcare, Inc.* excluded a physician's standard-of-care opinion where the physician offered a "scant and arguably incorrect account of the factual background of the events of this case." *Moore v. Naphcare, Inc.*, No. 2:22-CV-0256-TOR, 2025 WL 1348921, at *5 (E.D. Wash. May 8, 2025).

Here, Dr. Puerini admitted that the timeline contained in his report was not his work product at all. (Ex. B, 21:3-13). He testified that he requested counsel prepare a timeline for him and confirmed that it was "Mr. Merin and Paul" who assembled it. (Ex. B, 21:3-7). He further acknowledged that he requested the attorney-prepared timeline because he was unable to independently reconstruct the chronology to his own satisfaction, testifying that he asked counsel to prepare a timeline because he "couldn't put it together." (Ex. B, 103:7-10). The significance of that admission cannot be overstated, as timing is not a minor or peripheral issue in this case or in his opinion. Nearly every criticism Dr. Puerini levels at the medical providers depends on the sequence of events, including when symptoms allegedly manifested, when staff observed Mr. Magana, when interventions should have occurred, and how long Mr. Magana was supposedly unresponsive.

More troubling still, Dr. Puerini admitted in his deposition that his own recollection of the chronology was "vague" and that he could not independently reconstruct the timeline without assistance. (Ex. B, 103:7-10). The deficiencies become even more apparent when Dr. Puerini was asked to identify the factual basis for specific opinions. For example, Opinion No. 32 of his report asserts that Mr. Magana was continuously unresponsive "at least by 15:25" and relies on various timing assumptions concerning emergency care and staff observations. Yet when asked where he obtained the 15:25 time, Dr. Puerini answered: "I think I might've gotten it from the timeline I was given by the attorneys' office." (Ex. B, 104:3-4). In other words, Dr. Puerini could not identify an underlying medical record, deposition transcript, or video timestamp supporting a key factual assertion in his own report. Repeatedly, Dr. Puerini demonstrated an inability to independently recall or identify the facts underlying his opinions. He admitted he could not identify which specific

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

videos he reviewed. He could not say precisely what footage he relied upon. He could not identify the literature he reviewed regarding water intoxication. (Ex. B, 19:1-8). He admitted he had not reviewed any deposition testimony from the medical providers before criticizing their conduct. (Ex. B, 18:23-25). He failed to recognize that two different nurses were involved in the events at issue, a fact that caused him to immediately retreat from one of his primary criticisms once it was explained to him. (Ex. B, 107:13-21; 110:12-21). As in *Moore*, the result is an opinion built upon a thin, inconsistent, and uncertain factual foundation rather than a reliable application of expertise to the actual facts of the case. See *Moore*, 2025 WL 1348921, at *3, *5.

## II. Dr. Puerini's Opinions Are Not the Product of Any Reliable Methodology and Must Be Excluded Under Rule 702(c)-(d).

Even setting aside the thinness of his factual record, Dr. Puerini's opinions fail Rule 702(c)-(d) because they are not the product of any reliable methodology reliably applied.

### A. Dr. Puerini Applied No Articulated, Testable Methodology.

Rule 702(c)-(d) requires that expert testimony be "the product of reliable principles and methods" and reflect a reliable application of those methods to the facts, and the 2023 amendment underscores that "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Engilis*, 151 F.4th at 1049; Fed. R. Evid. 702. Because "knowledge connotes more than subjective belief or unsupported speculation," an opinion resting on the expert's say-so is not admissible. *Daubert*, 509 U.S. at 590.

That principle governs experience-based experts with particular force. In *Valencia-Lopez*, the Ninth Circuit held that an expert's "qualifications and experience are relevant, and indeed necessary[,] [b]ut they cannot establish the reliability and thus the admissibility of the expert testimony at issue." *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020). The expert there was excluded because he "never explained the methodology, if any, that he relied on to arrive at" his conclusion. *Id.* And in the in-custody-death context, *Neal-Lomax v. Las Vegas Metropolitan Police Department* held that where the ordinary "guarantees of reliability" such as peer review are absent, "the expert must explain his methodology precisely and must 'point to some objective source' supporting his methodology." *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp.

2d 1193, 1202 (D. Nev. 2008).

Dr. Puerini's report identifies no methodology beyond a generalized assertion that his opinions are "based on my medical review of the record, tempered by my extensive experience in the correctional milieu" and that the review was "primarily a clinical/legal review." (Ex. A at 3). He identifies no accepted diagnostic framework, no correctional-healthcare protocol, no analytical process, no differential methodology, and no objective standards that he applied to the facts. Instead, his report merely recites selected facts drafted by counsel followed by conclusions stated with certainty. His deposition testimony confirms that no identifiable methodology exists. When asked whether there was any different objective standard or methodology associated with his stated "legal review," Dr. Puerini answered simply, "No." (Ex. B, 20:5-8). More tellingly, when asked whether he relied on correctional-healthcare standards in crafting his opinions, he admitted he did not rely on the current standards: "The standards had recently changed this year, and I didn't have the most current standards, and so I'm going to say no to that; that I based my opinions on my memory of the standards[.]" (Ex. B, 20:14-18). He ultimately never identifies which standards he applied, how he applied them, or whether those standards were even current.

The same lack of rigor appears in his claimed review of the medical literature. Dr. Puerini testified that he performed research regarding water intoxication and psychogenic polydipsia before his deposition. (Ex. B, 7:21-25). But when asked whether he could identify the literature he relied upon regarding acute water intoxication, he simply answered: "No." (Ex. B, 19:5-8). Thus, even the limited literature review he references cannot be identified, tested, or evaluated. Instead of applying a discernable methodology, Dr. Puerini repeatedly substitutes personal impressions and subjective reactions for expert analysis.

For example, Opinion No. 16 states that Mr. Magana engaged in "amazingly excessive and clearly dangerous" water drinking. (Ex. A at 10). When asked what made the water consumption "amazingly excessive," Dr. Puerini did not reference any medical threshold, published literature, clinical criteria, or objective measure. Rather, he testified: "I clearly, personally could not have drank that much water in that much time. It was dramatic." (Ex. B, 25:9-12). That is not

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

methodology. It is a personal reaction.

Opinion No. 45, concluding that Nurse Chagger's late-entry note documenting that Mr. Magana was ambulatory, breathing normally, and able to verbalize his needs “belies believability,” is likewise not based on any reliable methodology and is contradicted by the limitations of Dr. Puerini’s own analysis. When shown Nurse Chagger’s note during his deposition, Dr. Puerini testified that it was “an inappropriate note” because it was entered after Mr. Magana’s death and represented, in his view, an attempt to “justify the actions of the health care providers.” (Ex. B, 33:23-34:5). But when asked whether the standard of care in correctional healthcare was always contemporaneous charting, he expressly answered: “No, it's not.” (Ex. B, 34:18-20).

Most importantly, Dr. Puerini conceded that he had no actual basis to conclude the observations documented by Nurse Chagger were inaccurate. Although he testified that he “tend[s] to discount notes made after the time of death,” he immediately admitted that “we can believe it, and it probably happened.” (Ex. B, 36:21-24; 37:3-4). Thus, Dr. Puerini's criticism is not based on any recognized medical, nursing, or correctional-healthcare standard. It is based on his personal skepticism toward a note entered after the patient's death.

This same pattern appears in his opinions regarding the events surrounding the emergency response. Opinion No. 35 states that the delay in entering the cell “could potentially amount to criminal behavior.” (Ex. A at 12). Yet at deposition, Dr. Puerini admitted: ‘Criminal behavior’ is probably overstating. I'm getting a little, maybe, overly Italian -- overdramatic -- whatever.” (Ex. B, 113:6-8). Once questioned about the basis for the opinion, Dr. Puerini reduced it to a personal reaction to what he remembered seeing on video.

Even his water-volume calculations reveal the absence of reliable methods. Opinion No. 15 states that Mr. Magana consumed “at least 15 glasses of water in under 3 minutes.” (Ex. A at 10). At deposition, Dr. Puerini testified that his estimate of total fluid intake was merely a “guesstimate”: “So it would guesstimate it was close to three, four liters of water.” (Ex. B, 25:17-19). When asked what that “guesstimate” was based on, he answered: “Six to eight ounce glasses of water, and I saw 15.” (Ex. B, 25:20-22). But that “guesstimate” rested on assumptions Dr. Puerini could not

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

substantiate. When asked about the size of the cup he allegedly observed Mr. Magana using, he admitted, “I can't say. Might have been eight ounce.” (Ex. B, 24:5-6). He then conceded that he did not even remember what the cup looked like. (Ex. B, 24:7-8). Thus, Dr. Puerini extrapolated a specific volume estimate from containers whose size, capacity, and appearance he could not identify with any certainty.

Ultimately, Dr. Puerini asks the Court to accept his opinions because he has personal experience in correctional medicine; Rule 702 requires more. As *Valencia-Lopez* makes clear, experience alone cannot establish reliability. Here, Dr. Puerini identified no objective methodology, relied on no identified standards, could not identify the literature supporting his conclusions, admitted he based opinions on his memory rather than current standards, and repeatedly justified conclusions with personal impressions and assumptions rather than testable analytical methods. Like the experts excluded in *Valencia-Lopez* and *Neal-Lomax*, his opinions are connected to their conclusions only by his say-so. Rule 702(c)-(d) therefore requires exclusion of his opinions.

**B. Dr. Puerini’s Causation Opinions Are *Ipse Dixit* With Too Great an Analytical Gap.**

Dr. Puerini’s causation opinion that Mr. Magana “would more likely than not have survived” had different care been provided is the paradigmatic type of *ipse dixit* testimony that Rule 702 forbids. The Supreme Court has made clear that “nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert,” and that a court may exclude opinions where “there is simply too great an analytical gap between the data and the opinion proffered.” *Joiner,* 522 U.S. at 146. Likewise, where an expert offers a causation opinion based on differential analysis, the expert must explain why competing causes were excluded and must “provide reasons for rejecting alternative hypotheses using scientific methods and procedures.” *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003). The methodology must be grounded in more than “subjective beliefs or unsupported speculation.” *Id.*

Here, Dr. Puerini did not perform any such analysis. Opinions 41 through 43 of his report assert that Mr. Magana “would more likely than not have survived water intoxication” had staff

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

shown "some care and compassion," had the response been "appropriate," or had staff not waited seven minutes before entering the cell. (Ex. A at 12). These opinions are stated as categorical medical conclusions. Yet nowhere in the report does Dr. Puerini explain the methodology by which he concluded survival was more likely than not. Instead, he simply leaps from alleged deficiencies in care to the conclusion that Mr. Magana would have lived. (Ex. A at 12).

The speculative nature of the survival opinions is illustrated by Dr. Puerini's testimony regarding the IV line that was established during the emergency response. In Opinion 33, he states that the fact an IV was started is "evidence that the patient's life potentially could have been saved had the emergency response been appropriate." (Ex. A at 11). At his deposition, however, he acknowledged that this conclusion was based on little more than inference and that there was "no solid evidence one way or the other." Specifically, he testified: "The fact that they were able to start an IV implies something. But I'm afraid it doesn't — you know, there's no solid evidence one way or the other. It does imply something." (Ex. B, 111:10-13). That testimony reveals the speculative chain underlying his causation opinions. Because a successful IV "implies something," that in turn becomes evidence that the patient could have been saved, which then becomes an opinion that the patient more likely than not would have survived. Rule 702 requires substantially more.

Moreover, the subjective nature of his opinions is underscored by the language Dr. Puerini repeatedly employs throughout his report. He states that if any staff member had shown "some care and compassion," Mr. Magana would have survived. (Ex. A at 12, Opinion 41). "Care and compassion," however, are not medical methodologies. They are value judgments. Likewise, Dr. Puerini opines that staff should have acted based upon "human decency" and "fundamental standards of care." (Ex. A at 12, Opinion 42). While such rhetoric may express disapproval of the events, it does not provide a scientific or medical foundation for concluding that different actions would, more likely than not, have altered the outcome.

This case therefore mirrors *Neal-Lomax*, where the court excluded a physician's opinion that a particular stressor was "more likely than not" a substantial contributing factor in a death because the expert failed to identify any objective source or methodology connecting the facts to

the conclusion. *See Neal-Lomax*, 574 F. Supp. 2d at 1203-04. Like the expert in *Neal-Lomax*, Dr. Puerini offers a bare causation conclusion without explaining the physiologic pathway, identifying supporting literature, performing a differential analysis, or ruling out alternative explanations. His survival opinions are therefore connected to the underlying facts only by his say-so – or *ipse dixit*. That is precisely the type of "analytical gap" that *Joiner* condemns and Rule 702 prohibits. *See Joiner*, 522 U.S. at 146.

## III. Dr. Puerini's Legal Conclusions and Opinions Must Be Excluded Under Rules 704 and 702(a).

### A. Dr. Puerini's "Deliberate Indifference" and "Criminal Behavior" Opinions Are Impermissible Legal Conclusions.

Although Rule 704 permits testimony that embraces an ultimate factual issue, it does not permit experts to instruct the jury on legal conclusions. Fed. R. Evid. 704; *Wiles v. Dep't of Educ.,* No. CIV 04-00442 ACK-BMK, 2008 WL 4225846, at *1 (D. Haw. Sept. 11, 2008). Courts consistently hold that an expert may not testify that conduct amounted to "deliberate indifference" because the term has a specialized legal meaning and directly addresses the ultimate constitutional issue the jury must decide. *See Melton v. Cnty. of Maricopa,* No. CV-21-00134-PHX-DWL, 2025 WL 2896092, at *17 (D. Ariz. Sept. 29, 2025); *Est. of Perez v. Morgan Cnty. Sheriff*, No. 116CV00645SEBDLP, 2018 WL 4590967, at *1 (S.D. Ind. Sept. 25, 2018); *Thomas v. Sheahan*, 514 F. Supp. 2d 1083, 1094 (N.D. Ill. 2007). Dr. Puerini repeatedly crosses that line.

In Opinion No. 18, he opines that "the physician in question was deliberately indifferent to the needs of his patient, Mr. Magana." (Ex. A at 10). Elsewhere he concludes that the failure to evaluate Mr. Magana reflected "deliberate indifference," that the seven-minute delay "almost certainly amounts to deliberate indifference," and that staff conduct "could potentially amount to criminal behavior." (Ex. A at 12). Those are not medical opinions. They are legal conclusions directed at the very issues the jury must resolve. Dr. Puerini admitted as much at deposition. When asked what he meant by "deliberate indifference," he acknowledged that "indifference is a legal term." (Ex. B, 30:12-14). Likewise, when questioned about his opinion that the conduct "could potentially amount to criminal behavior," he immediately retreated from the conclusion, testifying:





GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

"I'm no criminal lawyer. And I can't say definitively that this was criminal." (Ex. B, 112:13-14). He ultimately conceded that "'criminal behavior' is probably overstating" and attributed the language to becoming "overly Italian -- overdramatic." (Ex. B, 113:6-8).

Such testimony does exactly what *Wiles, Melton, Perez*, and *Thomas* prohibit: it substitutes the expert's legal judgment for the jury's. He may offer opinions regarding the adequacy of medical care, but he may not deliver the legal verdict. Those opinions should therefore be excluded. Fed. R. Evid. 702 and 704.

**B. Dr. Puerini's Systemic Jail-Conditions and Funding Opinions Do Not Fit the Issues in Dispute.**

Dr. Puerini's opinions regarding jail funding, institutional safety, and broader conditions at Santa Rita Jail should be excluded because they do not assist the jury in resolving any medical issue presented in this case. Rule 702 requires expert testimony to "fit" the issues in dispute by helping the trier of fact determine a fact at issue. *Daubert*, 509 U.S. 579, 591-92 (1993); *Hall v. Baxter Healthcare Corp*., 947 F. Supp. 1387, 1397 (D. Or. 1996).

These opinions do not fit. Dr. Puerini opines that "despite these millions of dollars being paid to the contracted healthcare corporation, essentially no medical care was delivered," and that "the Santa Rita/Almeda County Jail is not a safe place based on studies and court actions, particularly for SMI." (Ex. A at 12-13). Dr. Puerini was not retained to offer opinions regarding jail funding, institutional finances, or the overall safety of Santa Rita Jail. Rather, he testified that he was asked to "look at the case and give opinions about the care that was delivered," and specifically understood his role was "to look at the care and see if it was adequate, reasonable, and standard of care." (Ex. B, 14:9-10, 14:25-15:1). Thus, the issue for the jury is whether Dr. Mahajan, Nurse Chagger, and Nurse Hundal were deliberately indifferent when treating Mr. Magana on April 27, 2023, not whether Santa Rita Jail is adequately funded or whether the institution has faced criticism in unrelated proceedings.

These opinions are particularly unreliable because Dr. Puerini could not identify the "studies and court actions" on which he relied. At deposition, he admitted his opinion was based largely on an online search, could not identify any specific study, and acknowledged that he had

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

never performed any independent evaluation of Santa Rita Jail. (Ex. B, 117:6-13; 117:14-18). He further admitted that none of the materials he reviewed related to treatment for acute water intoxication. (Ex. B, 119:6-9).

Even if marginally relevant, these opinions should be excluded under Rule 403. References to "millions of dollars" paid to the healthcare contractor and assertions that Santa Rita Jail is "not a safe place" invite the jury to decide the case based on generalized criticism of the institution rather than the specific medical care at issue. That danger of confusion and unfair prejudice substantially outweighs any limited probative value. *See In re Hanford Nuclear Rsrv. Litig*., 534 F.3d 986, 1016 (9th Cir. 2008); *Jinro Am. Inc. v. Secure Invs., Inc*., 266 F.3d 993, 1006 (9th Cir. 2001). Because these opinions do not fit the issues the jury must decide and carry a substantial risk of distraction and prejudice, they should be excluded.

**IV. Dr. Puerini's Inflammatory Rhetoric Should Be Excluded Under Rule 403.**

Even if portions of Dr. Puerini's testimony survive Rule 702 scrutiny, Rule 403 provides an independent basis for exclusion. Courts have broad discretion to exclude expert testimony whose probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, or confusing the issues, and that discretion is "especially" broad with respect to expert witnesses. *Rogers v. Raymark Indus*., Inc., 922 F.2d 1426, 1430-31 (9th Cir. 1991); *In re Hanford Nuclear Rsrv. Litig*., 534 F.3d at 1016. That concern is heightened because jurors may give undue weight to opinions presented by an expert witness. *See United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973); *Buck v. Davis*, 580 U.S. 100, 121 (2017) *Jinro Am. Inc.*, 266 F.3d at 1006, 1010.

Dr. Puerini describes the care provided to Mr. Magana as "essentially a death sentence," (Ex. A at 11), labels staff conduct "totally irresponsible" and potentially "criminal," (Ex. A at 12), and characterizes the emergency response as "deplorable." (Ex. A at 12). These are not medical opinions. They are emotionally charged value judgments that add little, if anything, to a standard-of-care analysis while creating a substantial risk that the jury will decide the case based on outrage rather than evidence.

The prejudice is particularly acute here because Dr. Puerini himself later admitted that

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

describing the conduct as "criminal behavior" was "probably overstating" the issue and reflected that he was being "overdramatic." (Ex. B, 113:6-8). Having conceded that the rhetoric was exaggerated, Plaintiffs should not be permitted to place those inflammatory labels before the jury under the guise of expert testimony. Because these characterizations are inflammatory, minimally probative, and highly prejudicial, they should be excluded. *See Jinro Am. Inc.*, 266 F.3d at 1010.

## CONCLUSION

For the foregoing reasons, CFMG Defendants respectfully request that the Court exclude Dr. Michael T. Puerini's expert report, all forty-seven numbered opinions contained therein, and any testimony derived from or based upon those opinions under Rules 702, 704, and 403. Alternatively, should the Court decline to exclude Dr. Puerini in his entirety, CFMG Defendants respectfully request that the Court exclude:

(1) his causation opinions, including Opinions 33, 34, 41, 42, and 43, which conclude that Mr. Magana would or could have survived had different care been provided;

(2) his opinions regarding the quantity of water allegedly consumed by Mr. Magana and his alleged level of consciousness, including Opinions 15, 16, 21, 22, 28, 29, 30, 31, 44, and 45;

(3) his opinions that Defendants acted with "deliberate indifference" or engaged in "criminal behavior," including Opinions 14, 18, 35, and 45;

(4) his opinions concerning jail funding, systemic conditions, or the overall safety of Santa Rita Jail, including Opinions 39 and 46; and

(5) his inflammatory and prejudicial characterizations, including Opinions 18, 25, 35, 38, 39, 41, 42, 43, 46, and 47, which employ rhetoric such as "death sentence," "criminal behavior," "deplorable," "abysmal lack of care," and similar non-medical characterizations.

CFMG Defendants further request such other and further relief as the Court deems just and proper.

Dated: August 31, 2026 GORDON REES SCULLY MANSUKHANI, LLP

By: */s/ Kendra N. Stark*
Lindsey M. Romano
Kendra N. Stark
Bailey M. Frank
***Attorneys for Defendants***
***CALIFORNIA FORENSIC MEDICAL GROUP. INC., RAJENDRA MAHAJAN, SUMEET CHAGGER, and HARKAMALJIT HUNDAL***

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111

**CERTIFICATE OF SERVICE**

*Estate of Jesus Eric Magana v. County of Alameda, et al.*

U.S.D.C., Northern District of California, Case No.: 3:24-cv-04716

I, Kendra N. Stark, certify that this document, filed through the Court's ECF system on **August 31, 2026**, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Kendra N. Stark*