# EXHIBIT B

**In the Matter Of:**

ESTATE OF MAGANA vs COUNTY OF ALAMEDA

3:24-cv-04716-JD

# MICHAEL T. PUERINI MD

*July 30, 2026*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

that you had some depositions, but it still may be helpful.

So for the court reporter's sake, we want to not talk over each other. So that goes two ways. So when I ask question, I'll ask that you allow me to finish asking the question before you respond, and when you are answering a question, I will wait until you are finished to ask any follow-up question.

If, at any point, I ask you a question that you don't understand, can I get you to agree that you will ask me to clarify?

A. Absolutely.

Q. And if I ask a question and you do answer, can I assume you understood the question?

A. Yeah. As you say.

Q. I know we're not in a courtroom, and we're not testifying in front of a judge or jury, but I want to get on the record you understand that your testimony today is under oath.

A. Yes, I do.

Q. Can you please state your full name for the record?

A. Michael Thomas Puerini.

Q. Where are you currently located?

A. I'm in Portland, Oregon.

Q. Did you do anything to prepare for today's deposition?
A. Yes. I spent time yesterday -- no. On Tuesday with Mr. Merin. And last night I did a little bit of research, reread some of the files, and looked at my notes.
Q. When you say you reread some of the files, can you be a little more specific for me?
A. I know that I specifically wanted to look at the autopsy and review the autopsy. I was looking at my own report to make sure that I could back up my statements. I did a little bit of research online, using Google.
Q. Okay.
A. I may have looked at a medical record or two or some sections of the medical record to refresh my memory on where I got my opinions from.
Q. Did you review anything that was not identified in your initial --
A. No. No.
Q. When you say you did some research, what was that research --
A. I was refreshing my medical knowledge of water intoxication and -- and psychogenic polydipsia is the medical term for when water intoxication

(Recess, 1:23 p.m. to 1:29 p.m.)

BY MS. FRANK:

Q. Dr. Puerini, can you be specific for me and tell me what you were asked to offer your opinion on in this case?

A. It wasn't that much different from -- the first contact was in February with Mr. Merin and wasn't different from any other case I had been asked to review. I was asked to look at the case and give opinions about the care that was delivered. I was not asked any specific question.

I pride myself in these cases, in doing an independent review, and the less information I have, the better off I am, I believe. I need enough information in order to make a decision about taking the case because I'm selective, and certainly, for plaintiff case, I wanted a really strong case, and something went on between Mr. Merin and I in which I decided that it was a strong case and that I should take a look at it and give an opinion.

I've had examples in the past where I did an initial review and I didn't think it was a strong enough case or I didn't like it. As far as specific questions, I knew it was a plaintiff's case, and I knew that it was my job to look at the care and see if

it was adequate, reasonable, and standard of care.

MS. FRANK: I'm going to share a document on the screen, and I'm going to ask the court reporter to please mark this as Exhibit A.

(Exhibit A marked for identification.)

BY MS. FRANK:

Q. Can you see this --

A. Yes.

It looks like it's my report.

Q. This is your report; correct?

A. I believe so.

Q. I'm going to scroll down here so we're on Exhibit A, page 2 and 3, document review section. We previously talked about the documents you reviewed in preparation for this deposition, but this list would include the deposition of the deputy.

Is there anything else that you can remember reviewing before you formed your opinion?

A. Not as far as I know. Obviously, these are -- there's numbers and, you know, which video, et cetera. So I can't really identify these, but I've -- I was careful in my review of the document to make sure that that was noted; that I've looked at this. I did review the Candelario deposition.

Q. When you received materials to review for

this deposition, did you decide what materials you wanted to review?
A. I was sent multiple additional documents sometime earlier this year, and I didn't look at --
MS. FRANK: Is he paused for others?
(Reporter clarification.)
(Recess, 1:34 p.m. to 1:43 p.m.)
BY MS. FRANK:
Q. All right. I'm going to reshare my screen to the same exhibit, Exhibit A, where we left off, and I want to make sure we can see my screen.
Can you see my screen?
A. I can.
Q. Okay. We were talking about the documents review, and you were telling me about how you decided which documents to look at in forming your opinion.
Can you tell me how you made the decision --
A. I reviewed all the documents that were initially sent to me by Mr. Merin's office at the time that I did my initial report. Subsequently, I received a file, a very large set of files, on a zip drive, and it was clear that there were additional files. I didn't review those. I reviewed what I reviewed initially for my draft report.
Last night I reviewed the deposition of

Candelario and -- just as a way of refreshing my memory so that I understood what the custody people were saying. I had already reviewed all the medical issues, and if there were important additional medical issues in those files, I presume Mr. Merin would have told me, and I didn't look at those. We were going to do a deposition. I only had a week, and I discussed it with Mr. Merin and Paul, and we decided that I wouldn't review any additional files.

Q. Okay. There are a lot of videos. Did you review the videos on this list in their entirety?

A. I don't think I did. I specifically asked, looked at it, and realized there were -- they were long.

I essentially didn't want to waste a lot of time. This is all me. I value my retired time, and I wanted to keep it cost-effective, and I didn't separate them out; so I can't tell you what I reviewed. But I would be commenting in my report on video clips that I had reviewed.

That was not at the behest of the plaintiffs' counsel but on my behest to keep the cost -- I'm expensive. I'm very aware of that. And I'm not hungry. If you get my drift.

Q. Understood. If we see a video on this list,

you didn't necessarily reviewed the entirety of the video, but you reviewed a portion of the video?

A. Yes.

Q. I see, on this list, we have the first amended complaint filed.

I want to be clear: I'm not a gotcha lawyer. I'm curious.

The active complaint is the second amended complaint. I want to verify -- have you reviewed the operative second amended complaint, to the best of your understanding --

A. No, I have not. This list is complete of what I've read and gone through, and I didn't -- no, I don't think so.

Q. I'm going to ask some questions. I think I know what the answer is, but I still need to get it on the record.

It looks like -- is it fair to say you did not review the written policies and procedures from CFMG or --

A. I don't remember reading any policies and procedures.

Q. Same question: Is it fair to say you didn't review any depositions of the medical providers?

A. I didn't.

Q. You had looked at some literature regarding water intoxication. Do you remember specifically what kind of literature that was and who it was published by?

Can you tell me, or do you remember any specifics about the literature you reviewed on acute water intoxication?

A. No.

Q. We're on page 3. I want to look at the methodology portion. It says this is primarily a clinical/legal review.

What is a legal review?

A. It's essentially the same review as I say later, the same review I would do as a medical review, but with a specific intent to look at the legal proceedings in question.

Q. What are the kind of standards that would guide a legal review as opposed --

MR. MERIN: Object to the form of the question.

You can answer the question, Doctor.

BY MS. FRANK:

Q. This is the first objection. Unless your attorney instructs you not to answer, the objection is just for the record; so you can still answer the

question. If you forget --
(Multiple people speaking simultaneously.)
(Reporter clarification.)
BY MS. FRANK:
Q. Is there a different objective standard or methodology for a legal review as opposed to a clinical review?
A. No.
Q. And as far as the standards that you were applying, are you familiar with the -- standards?
A. Yes.
Q. Did you rely on them in crafting your opinion --
A. The standards had recently changed this year, and I didn't have the most current standards, and so I'm going to say no to that; that I based my opinions on my memory of the standards, having been a surveyor under previous standards through 2025.
(Multiple people speaking simultaneously.)
BY MS. FRANK:
Q. I'm going to Section 5 now, and we're going to be looking at time line and summary of facts.
Can you walk me through the primary document that you used to make this time line?
A. No. In the past, when I've put together

these documents, one of the most time consuming things for me and that had little relevance was put together the time line. This time line was something that I requested; that they put together a time line for me. It was Mr. Merin and Paul -- I've forgotten how to say his name -- who put this time line together for me with the assurance that it was --

(Multiple people speaking simultaneously.)

(Reporter clarification.)

BY MS. FRANK:

Q. Okay. So this time line was written for your review by counsel?

A. Correct.

Q. Specifically, in this time line, if we look on page 5, we have a transcription of a conversation. This transcription -- did you watch the video that corresponds to this conversation?

A. Yes.

Q. Do you speak Spanish?

A. I do. Enough to get by.

Q. Were you able to verify that these translations were correct?

A. Pretty much.

Q. All right. So looks like Section 5 goes to page 8. In the time line that you received in order

aware of this visit at the time that you crafted your opinions; correct?

A. Again, I vaguely remember there was one brief nursing encounter at the cell door.

Q. Okay. All right. We're going to the Section 6 of A, the expert opinions. I'm going to start by looking at Opinion 15. It says on video, on the morning of this death, Mr. Magana is seen to be rapidly ingesting water, his cell floor covered with water.

It's seen on video; that his floor is covered in watery fluid. Is this something you personally saw on the video?

A. I don't remember.

Q. And we see on video Mr. Magana is seen to be ingesting at least 15 glasses of water. Is this something --

(Multiple people speaking simultaneously.)

(Reporter clarification.)

BY MS. FRANK:

Q. Mr. Magana is seen to be ingesting 15 glasses of water in three minutes. Is this something that you remember seeing on video?

A. I remember going over the video, noticing the exact time that went by, and counting glasses of

water.

Q. You counted 15 cups of water on video?

A. At least 15 cups. I saw him ingest that much.

Q. Do you know how big the cup was?

A. I can't say. Might have been eight ounce.

Q. Do you remember what the cup looked like?

A. No.

Q. Do you remember -- strike that.

You said you remember counting the time on the video. When you say counting the time, is this the time that a certain deputy was present at the cell?

A. When I first saw him drinking, I noticed the time stamp on the video, and I wrote it down, or I noted it. I counted the number of glasses that he drank. I wanted to be factual, and I noticed, at the bottom, what the time stamp was. So I -- that's how I came up with this number of glasses and the number of minutes. I remember specifically in February having to go back and forth over that video several times.

Q. I know we just briefly mentioned the size of the cup. Is it possible it was less than that?

A. Anything's possible. Yes.

Q. Is it possible, in the realm of more than 50

percent likely, that it was less than eight ounces?
A. It's possible. I don't think it's relevant.
Q. I want to look at Opinion 16. The nurse reported Mr. Magana's amazingly excessive and clearly dangerous water drinking as seen and heard on video and referred him to doctor on-site.
You say amazingly excessive. What is an amazingly excessive amount of water?
A. I clearly, personally could not have drank that much water in that much time. It was dramatic. The video was dramatic as to how much he was drinking it, how he was drinking it. It was an impression that I had after watching the video.
Q. Do you have any estimate, in volume measurement, as opposed to glasses or cups, of how much water he drank?
A. Specifically, in the three minute period that I watched on the video? So it would guesstimate it was close to three, four liters of water.
Q. What is that guesstimate based on?
A. Six to eight ounce glasses of water, and I saw 15.
Q. In cases of acute water intoxication, if someone is vomiting the water back up, does that impact how much water is consumed by the body?

We're now at Opinion 17 -- no. We're now on 18.
In my opinion, on a more likely than not basis, based on standards of decency in minimum care, the physician was deliberately indifferent to the needs of his patient, Mr. Magana.
When you say standards of decency, what do you mean by that?
A. When a patient is front of you in a correctional institution, you need to believe them, listen to the nurse, and you need to address the concerns thoroughly. This is decent care. This is an opinion, and indifference is a legal term, but this was my opinion based on what I saw in the video, what I read in the chart.
Q. When you hear deliberate indifference, what does that mean to you?
A. That the patient was ignored; that you knew something was wrong but didn't address it. Which is what I think happened.
Q. If we look at Opinion 19, we're talking about the medication. Zofran was prescribed by the physician. No additional monitoring, testing, or treatment was prescribed.
Is observation in a medical housing unit considered monitoring?

was that he was okay. He was not okay. It's clear that he was not okay.

(Exhibit B marked for identification.)

BY MS. FRANK:

Q. It's CEFMG000466. Do you recognize this part of the record, Dr. Puerini?

A. I've reviewed it at some point in the past.

Q. Okay. So it looks like it is the medical record that you reviewed?

A. Yes.

Q. We have here a note by Sumeet Chagger. Do you remember reading this note?

A. I believe I did.

Q. Do you remember what was contained in this note?

A. I remember that it was a note in a dead person's chart entered sometime after his death that tried to justify something, and I think it's trying to justify that he was very aggressive in the past, and that that would be the reason why they didn't go into his cell sooner when he was clearly not breathing.

Q. Okay.

A. This is a note, an inappropriate note, in the sense that the chart is to be used for patient care. After the patient is dead, entries are inappropriate

and only serve to justify the actions of the health care providers who delivered the care before he died and were trying to make justification for that care. That's my only possible interpretation of a note made several hours for somebody who's already dead.

Q. It's never appropriate to enter information into a chart for a patient who's dead?

A. I say that is true. The chart is to take care of patients and needs.

MS. FRANK: I think we lost him for a second.

(Reporter clarification.)

(Discussion off the record.)

BY MS. FRANK:

Q. When we -- let me start the question -- left off, we were talking about whether it's ever appropriate to enter information into a patient's chart after they pass away.

In a correctional health care setting, is the standard of care always contemporaneous charting?

A. No, it's not.

Q. If the standard of care is not contemporaneous charting and a provider saw a patient a couple hours before they pass away, how should they indicate that they saw that patient on his chart?

A. This note is from 1220. The note is written

patient is dead. It's my opinion. I can give you a reference for this.

Q. So part of this note says rounds were performed in regular intervals to check on patient. At 1:20 RN approached patient at cell door to evaluate on his current health. Patient had steady gait. No visual injuries at this point. Patient still not agreeing to treatment, but patient asked if he could go back to his unit. We will monitor him for a few more hours, and then he could go.

Do you remember reading this prior to drafting your opinion?

A. Yes. I read this for sure.

Q. Opinion 19 was that no monitoring occurred because nobody checked on his. Is it fair to say this note shows that both a doctor and nurse checked on him?

MR. MERIN: Object to the form of the question.

THE WITNESS: There is notation in this note that he was checked on at 1:00. I tend to discount notes made after the time of death in a chart as protective to the people who were there and not beneficial to the chart.

If we believe it -- and I have no reason not

to believe it, really, aside from the fact that it's protective of the providers, the nurse and doctor. Aside from that, we can believe it, and it probably happened, but my point was that this patient was unconscious from 2:00 on. So he was unconscious for somewhere -- two hours before his death.

BY MS. FRANK:

Q. How do you know --

A. He was not checked again as far as we can tell.

Q. How do you know if he was unconscious at 2:00?

A. We can go through the videos, but the notes and the testimony, I believe, of Mr. Candelario, I believe, note that he saw some minor movement. He might have seen the fingers moving but that there was a point where he testifies that there was no change in the body position from 2:00 on. There is a point where he mentioned that there was no significant change in the body position for an hour.

This is a medical unit, and the patient should be observed medically. To have one check between 10:00 a.m. and the time of death at around 4:00 -- we could go back to the time line.

To have one check at the cell door for a

observation was absolutely inadequate for a person who's potentially water intoxicated. They need to be observed in an infirmary setting; they need to be treated. This person was not treated. Treatment would be to check sodium, a $5 test. No emergency room visit happened. Nothing really happened. He was observed in a cell, and nobody went in that cell for the six hours before his death. That's observation, but it's not medical care.

MS. FRANK: Let's go off record.

(Recess, 2:54 p.m. to 3:00 p.m.)

BY MS. FRANK:

Q. Okay. We're back on the record. We are talking about Opinion No. 19, which said that there was no additional monitoring, testing prescribed.

Based on the testimony that I just heard you give, Dr. Puerini, my understanding is you think there was not useful treatment. But is it fair to say that there was no treatment?

A. No appropriate or useful treatment was prescribed.

Q. Okay. And that's different than no treatment was prescribed; right?

A. It's true, yes.

Q. I would like to talk about the -- you

note where they were describing Mr. Magana. They're saying his speech is close to inaudible, eye contact was avoided, and was cooperative. And, then, another indication: Soft spoken but aggressive and assaultive towards deputies.

Do you remember reading this?

A. I don't. I'm reading it now.

I have some questions. Go ahead.

Q. You're not allowed to ask --

(Multiple people speaking simultaneously.)

BY MS. FRANK:

Q. So my question on this would be does this also resemble the way he presented to Dr. Mahajan in the OPHU?

A. Yes.

Q. His demeanor supported altered mental status. Now that we re-reviewed some mental health records, is it fair to say that his mental status and presentation was consistent with how he previously presented to mental health providers?

A. Yes. But may I add a statement? Mental health was not consulted about him drinking 20-plus glasses of water. They were not consulted about him. The mental health people didn't do anything because he needed to be on medication, and schizophrenia is

care?
A. The job of the physician in a correctional facility is to get the information in order to take care of his patient. This physician mentioned nothing about the nurse telling him that this patient was forcefully drinking 15 to 20 glasses of water. He didn't ask additional information, examine the patient regarding this, evaluate the patient. He ignored the symptom, whether it was intentional or not.
Q. My question is a little different in that, if your opinion is, at that point, he required emergency care, what, based on what Dr. Mahajan knew at that time, supports that he needed emergency care?
A. The drinking of 20 glasses of water in a forceful situation and the concern of the nurse, both of which he seemed to ignore.
Q. 15 to 20 glasses of water was the system -- that you're using to determine he should have been sent to the emergency room?
A. Yes. And I go to say what might have been done if that didn't happen.
Q. I want to look at 25. I wanted to get clarity. On Opinion 25, you mentioned active medical monitoring.
Can you tell me what you mean by active

was because there were timestamps, but it wasn't the actual time. I don't get it -- what the times were that were on there. They give you a relative time. That's it.

The medical record was difficult because, as you've already noted, even the doctor visit was timed sometime after his actual visit happened. So I -- I -- I think that -- so I'm gonna say that I -- my -- my timeline early on was vague, and that was part of why I asked the -- the -- the -- whoever it was -- to get me a timeline because I couldn't put it together --

Q. Okay.

A. -- perfectly and, at least, not to my satisfaction.

Q. Okay. But the timeline that you relied on in your opinions was not the one that was created for this report?

A. I don't recall looking at their timeline -- at the timeline in the report while I was writing my opinions. I don't recall doing that.

Q. I'm going to put back on the screen what is Exhibit A. And it is --

A. Okay.

Q. -- again, the report of Dr. Puerini. I wanted to look specifically at the opinions that relate to the emergency care and the timing around the emergency care. So it says, "Mr. Magana was found to be continuously unresponsive, at least by 15:25, on the day of his death."

Do you remember if you got this time from the medical record?
A. I think I might've gotten it from the timeline I was given by the -- by the attorneys' office.
Q. Okay. We see another opinion, No. 32: "Emergency measures began soon after healthcare staff entered the cell at approximately 15:28. The nurse's note at 17:08 documents that Magana was found to be unresponsive at 15:25. This is patently false, based on video evidence of the seven-minute delay."
So, I wanted to ask: What is the seven-minute delay, time-wise, that you're referring to? Where are you getting that from?
A. I'm getting that from the video of the officer and the nurse at the cell door, observing and knowing -- seemingly knowing -- that the person wasn't breathing but not going into the cell because of the officer's safety concerns.
Q. Did you see Dr. Mahajan attempt to enter the cell?
A. I don't recall. I think he did. I think the nurse and the -- and the doctor asked the officer to let them in, and he decided -- the officer decided that that wouldn't be appropriate.
Q. So when the nurse notes that he was found to be unresponsive at 15:25, what are you arguing about that is patently false?

the patient and the second visit where she thought he probably was breathing. But she had no way of determining whether he was conscious or not at that point because she didn't try to arouse him in any way, didn't talk to him, didn't enter the cell to examine or evaluate him in any way.

And so we -- so, briefly, I can't say that she knew whether he was conscious or not. But, for me, that's a problem. And the falseness is that we know that he was not fully conscious from the fact that he was not moving for over an hour. It may not have been an intentional falsehood on the part of the nurse. But it was false. False information.

Q. Do you understand there to be two nurses involved in this litigation?

A. I don't know the nurses. I don't know their names.

Q. Okay. Do you remember which nursing note you're referring to when you say it's "patently false"?

A. Give me a minute. Well, it's whoever said that he was unresponsive -- but -- at 15:25. And I --

Q. Okay.

A. -- don't know which one that was without the record in front of me.

Q. If I represent to you that that was Nurse Hundal --

A. Okay.

Q. I -- I -- let me -- let me walk through what I hear

you to be saying regarding the falsity. And correct me if that -- if I'm incorrect. Let me -- let me finish -- kind of repeat back to you what I've heard, and you can correct me if I'm wrong.

Your issue with the documentation that he was found unresponsive at 15:25 is that, from your understanding, the nurse would have seen him at 2:00 when he appeared to be unconscious.

Is that fair?

A. That is fair.

Q. Okay. If I --

A. He appeared to be unconscious.

Q. If I represent to you that the nurse who wrote the note about finding him at 15:25 is not the same nurse who saw him at 2:00 p.m., does that change this opinion?

A. Well, it changes the opinion in the sense that -- that she should have known. But it -- it -- and it -- and it changes the opinion that implies that she was putting a falsehood in her note. That -- that, it does change.

Q. Okay.

A. 'Cause it takes away the falsehood in the record.

Q. Okay.

A. It doesn't take away the poor care, in my opinion.

Q. Okay. So, Nurse Hundal, who is -- who wrote the emergency care note that we understand this to be referring

And -- but -- but, again, I've already conceded that it's possible that there was not an intentional falsehood: rather, a misstatement of the facts. I saw that he was -- was not responding in the cell for seven minutes before I got in there. He seemed to be unresponsive for a longer period of time. Something more complete.

But I -- I hear what you're saying. And I think I've clarified what I meant by my opinions.

Q. Okay. So is it more fair to say -- or, I guess, is it fair to say that your issue seems to be more with the completeness of the note rather than the falsity of the note?

A. The word "false" may be overstated. False -- though, my meaning "false" meant not -- "not correct," that he had been unconscious for a longer period of time than that.

Q. Okay.

A. So "false" implies -- I -- I understand what you're saying. "False" implies that there was wrongdoing on the part of the nurse, that she said something intentionally -- a lie -- or -- or something like that. And I don't mean to imply that.

Q. Okay. If we look at 33, we see it says, "An IV was started at approximately 15:38. This is evidence that the patient's life potentially could have been saved had the emergency response been appropriate."

Can you just walk me through how the IV supports the potential saving of -- of the life?

A. Starting up an IV implies that there's some sort of viability -- that there's a blood flow. Frequently, in these kind of code situations, a -- a -- a peripheral IV like this cannot be started under -- you know, if the person is already dead, they need to put a bone IV in -- which eventually got done -- or a central IV into the bigger veins.

The -- the vein itself was penetrable -- was -- so -- so it -- the fact that they were able to start an IV implies something. But I'm afraid it doesn't -- you know, that -- there's no solid evidence one way or the other. It does imply something.

Q. So it implies viability? Is that what you were saying?

A. It implies viability. Yeah. Okay.

Q. Did you happen to read the expert opinion of the forensic pathologist that was put forth by the plaintiffs in this case? It was Dr. Kris Sperry.

A. No.

Q. Okay. I'd like to talk now about Opinion No. 35. And, very briefly, I'm not planning to go one by one for the rest of them. I just want to clarify that.

I -- I have a couple more specifics to ask about. But just for everyone on the call, I'm not planning to go number

by number anymore.

For No. 35, the opinion states, "It is totally irresponsible for custody and healthcare staff members to wait seven minutes before entering a cell of an unresponsive patient who was not breathing. This could potentially amount to criminal behavior on the part of these staff members and almost certainly amounts to deliberate indifference."

So I'd like to talk about the video that you watched or the records that you saw that support this opinion.

And I'd like you to tell me: What in that opinion, specific to the healthcare staff, supports your belief that this could potentially amount to criminal behavior?

A. So I'm no criminal lawyer. And I can't say definitively that this was criminal. It was wanton disregard for the patient in that they clearly could not see him breathing. He clearly was unconscious in the cell. And he clearly was not responding to pounding on the door, kicking the door, rattling the door, making as much noise as possible.

The patient was unresponsive and almost certainly not breathing because they did not observe him to be breathing. And that's documented in more than one place. And so, if they know that their patient isn't breathing, he's not moving, and he's clearly not responsive -- and that happened seven minutes before they entered the cell -- that's so

negligent as to be alarming.

And, frankly, I was alarmed at what I was watching on the videos. It's -- it's enough to cause you nightmares. You know, I -- I hate watching people die on video. And that's what it seemed to me that I was watching.

And "criminal behavior" is probably overstating. I'm getting a little, maybe, overly Italian -- overdramatic -- whatever. But the bottom line is that, when you think that somebody is not breathing, you get in there, and you try to help them.

And it's not equivocal. I don't care how dangerous they might be perceived as being. That's why you're in a facility. That's why everybody has batons and tasers and all kinds of things to control a patient. If there's -- if there's an issue, they have ways of dealing with it. That's the nature of a correctional facility.

So it bothered me a lot that they -- they declined to go into the cell. I get it. Somebody was worried about getting beat up or something. I get it.

But when you -- when you clear -- when you're pretty darn clear that somebody's not breathing, you open the cell, and you find out if they're breathing or not. You don't wait until five other people can come there to help you. I'm sorry. That's just not all right, in my opinion.

Q. So -- do you -- but you remember, in the

to -- are those the ones that are outlined in the complaint?

A. That may be. I did read the complaint. I also looked it up online.

Q. Okay. Can you recall any other specific studies or court actions that you reviewed in creating this opinion?

A. When I looked online about this, it was easy enough to find that there was a successful lawsuit and that they were under -- under a court order. And -- and -- and I can't give you a specific reference. I can come up with one, if you wish. But -- but it was basically an online search that gave me the information. And I was -- I was in the -- the court documents. I didn't review them in great detail. But there are court documents online that I found.

Q. Okay. Have you ever done any independent evaluation or research of Santa Rita or Alameda County Jail?

A. No. I -- I am -- I was the -- the court monitor for Fresno County for a couple of years. I didn't like the work. But -- so I didn't -- I didn't continue in on it.

But -- but they had similar issues. And it was the same healthcare provider at -- at question in Wellpath, or whatever they're called these days.

Q. So is it your understanding, based on what's written here -- like SMI and how you just described, I think you're referring to the consent decree that this was primarily focused --

delivering better healthcare and, specifically, better care for their seriously mentally ill populations, like Mr. Magana. That's --

Q. As far --

A. -- my opinion.

Q. As far as you remember, did any of the studies or court actions that you reviewed for this opinion relate to treatment for acute water intoxication?

A. No.

Q. Okay. My -- my last couple questions are standard, annoying, attorney questions.

But I would like to ask if we have discussed, throughout this report, all the opinions you would offer at trial, if asked.

A. We briefly addressed the fact that I haven't read all of the -- all of the files that were presented to me. And I might come up with some additional opinions. For example, after reading Alaverez (Ph) -- is that his name? Alaverio (Ph)? I've forgotten. But the --

ATTY. MERIN: It's Candelario.

THE WITNESS: The -- the correctional officer's deposition that I read, there were a couple of specific things in there that I -- that I might want to mention. I can talk with Mr. Merin or -- or with you, even, about making a supplemental report, if that's necessary, before trial.

C E R T I F I C A T E

I, Elise Rienstra, a nationally Certified Verbatim Reporter, being empowered to administer oaths and affirmations remotely, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using oral shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of the deposition in a Federal Case, before completion of the proceedings, review of the transcript was not requested.

WHEREOF, I have this date subscribed my name.

Elise Rienstra
________________________________________

Elise Rienstra, CVR No. 8318
WA-CCR No. 23034297
OR-CSR No. 240110

UT-CCR No. 14200178-7801

DATED: August 12, 2026