# EXHIBIT H

Kris Sperry, M.D.
Forensic Pathologist

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

July 5, 2026

Re: Jesus Eric Magana

My name is Kris Sperry, M. D. I am a Forensic Pathologist, certified by the American Board of Pathology in Anatomic, Clinical, and Forensic Pathology.

I graduated from college at the Kansas State College of Pittsburg, in Pittsburg, Kansas, in 1975. Six weeks later, in July of 1975, I started medical school at the University of Kansas School of Medicine in Kansas City, Kansas. I graduated from there with an M. D. Degree, in June of 1978. In July of 1978, I started an internship at the Allentown Hospital, in Allentown, Pennsylvania. After completing the internship at the end of June of 1979, I began a two-year commitment with the United States Public Health Service, Indian Health Service Branch. I was stationed in Red Lake, Minnesota, on the Reservation of the Red Lake Band of Chippewa (Ojibway) Indians. Here, I was paying back the Federal Government for the financial assistance they gave me to get through medical school.

I was honorably discharged at the end of June, 1981, whereupon I began a residency in Anatomic and Clinical Pathology at the University of New Mexico School of Medicine. I completed the residency at the end of June, 1985, and immediately began a Fellowship in Forensic Pathology with the Office of the Medical Investigator for the State of New Mexico. I completed the Fellowship at the end of December of 1985, and this ended my formal training. I took and successfully passed the certifying examinations for Anatomic Pathology, Clinical Pathology, and Forensic Pathology.

At the beginning of January of 1986, I began working with the Office of the Medical Investigator for the State of New Mexico, as a Medical Investigator (Forensic Pathologist). I stayed with that Office for the next four years, and at the end of December of 1989, I relocated to Georgia, where I began working with the Fulton County Medical Examiner's Office in Atlanta, Georgia. A year later, I was promoted to Deputy Chief Medical Examiner with the Fulton County Office. I stayed with the Fulton County Office until June 17, 1997, when I accepted the position as the appointed, first

Chief Medical Examiner for the State of Georgia, with the Georgia Bureau of Investigation, Division of Forensic Sciences. I held this position for the next 18 years and 5 months, when I retired from Service with the State of Georgia.

During the course of my training and career, I have personally performed more than 6,800 autopsy examinations, and I have seen, witnessed, reviewed, and supervised approximately 88,000 to 90,000 other autopsy examinations. I have personally performed approximately 100,000 death case reviews in which no autopsy was indicated or performed. I have testified live, in courtrooms, 815 times, in more than 35 states, Germany and Japan for the United States Military, in American Samoa, and in United States Federal District Courts in at least 25 jurisdictions throughout the United States. In courts, I have qualified as an Expert and been allowed to testify in the fields of Anatomic Pathology, Clinical Pathology, Forensic Pathology, Death Investigation, Injury Causation, Injury and Trauma Interpretation, Childhood Injury and Inflicted Injury, Gunshot Wounds, Terminal Ballistics, Instantaneous Traumatic Incapacitation vs. Delayed Incapacitation, Asphyxial Deaths, Conscious Pain and Suffering vs Unconsciousness and Pain Insensitivity, and other specific elements of Forensic Medicine and Pathology. I have extensive experience in examining and evaluating deaths that occur while in the custody of law enforcement agencies, including fatalities at, around, and shortly following being arrested, and deaths occurring while incarcerated in all manner of penal institutions.

A more complete accounting of my training, experience, and career are found within my Curriculum Vitae, which is attached to this report.

I have been provided with what I understand to be a comprehensive compilation of the discovery in this matter, relative to Jesus Eric Mangana. Among many other various documents, I have specifically reviewed the following materials and records which I believe comprise the factual elements and background information that is relevant to me, as a forensic pathologist, and which provide the basis for my opinions regarding Daniel Ray Silver's death:

Coroner Investigator's Report
Autopsy Report
Postmortem Toxicology, including Vitreous Electrolyte Analysis
Medical Records, Santa Rita Jail (Alameda County Sheriff's Office)
Medical Exam Timeline, Transcribed from Video Surveillance Documentation
Falck Alameda County Ambulance Response Record, 4/27/2023
Deposition Transcript, Eugenio Martinez

The following narrative, generated by this writer, is meant to establish the relevant contextual background for the events prior to, at an around, and following the death of Jesus Eric Magana. This is not meant to comprise a comprehensive accounting of all events, actions, and interventions provided by individual staff within the jail; all such

detailed information is assumed to be contained within the myriad discovery documentation components.

Jesus Eric Magana was a 26 year old male, who was incarcerated in the Santa Rita Jail, which is overseen by the Alameda (California) County Sheriff's Office. On the morning of April 27, 2023, it is reported that at and around 0730 hours, he was being removed from his cell, when he "attempted to kick Sgt. Martinez." At around 1012 hours, another inmate alerted Deputy Baker that Mr. Magana was "projectile vomiting" in his cell. The cell floor appeared to covered in vomit, Mr. Magana's pants were wet, and he appeared ill. Mr. Magana responded positively when questioned as to whether he vomited, and also indicated that he was not feeling well. About 20 minutes later, Deputy Baker saw Mr. Magana vomit in his cell, and he told Mr. Magana again that he was calling a nurse.

At 1038 hours, Deputy Gilkerson responded to a call from Deputy Baker, and saw that the floor and toilet were covered in liquid. Deputy Gilkerson called his supervisor, Sergeant Martinez, who arrived very quickly, and found that Mr. Magana was in obvious distress. As they were watching, they saw Mr. Magana consume large quantities of water from the sink in his cell, vomiting afterwards. According to the deputies, Mr. Magana drank approximately 15 to 20 cups of water just while they watched, and they had no idea how much water he may have drank before they arrived at his cell. Mr. Magana told Sergeant Martinez that he was vomiting, when this was queried.

Par Kaur, R.N., arrived at the cell, and she was told that he was projectile vomiting. Mr. Magana continued to drink water from his sink with the cup while Nurse Kaur was present. He was ordered to stop drinking, but continued to do so. While the staff was watching, he continued to drink from the sink, rapidly consuming what was estimated as another 15 to 20 eight-ounce cups of water. Sgt. Martinez stated, "We gotta get him out of there. He has to stop drinking all of that water," and Nurse Kaur agreed. The water to the cell was shut off. Sgt. Martinez expressed to Nurse Kaur that Mr. Magana should be transferred to the Outpatient Housing Unit (OPHU), for medical observation. Nurse Kaur agreed, and requested that the custody staff transfer him.

At 1052 hours, Dr. Mahajan diagnosed gastritis, and prescribed Zofran (for vomiting) and Gatorade. Mr. Magana was seated in a wheelchair, shackled and handcuffed, and appeared quite subdued, moving very little in the wheelchair, passive and listless. At no time was he aggressive, or displayed any of the aggressive physical behavior that had been reported earlier in the day. At no time was he yelling, or exhibiting any verbally abusive behavior. The entirety of the physical examination consisted of Dr Mahajan placing his stethoscope on Mr. Magana's chest for a few seconds. The specifics of the examination of Mr. Magana by Dr. Mahajan are documented in a recording, the timestamps of which reveal that Dr. Mahajan's entire encounter with Mr. Magana was just seconds less than five minutes. No blood was drawn for any laboratory studies, nor any other diagnostic procedures instituted. At 1105 hours, only 13 minutes after he had been first examined by Dr. Mahajan, Mr. Magana was placed in a medical observation

cell (OPHU-WEST-11), for a four-hour watch because of the diagnosed nausea. He was placed face-down on a cot, unrestrained, in a bare cell; he offered no resistance and was passive. Two deputies (Tsang-Lee and Candelario) and two nurses (Chagger and Hundal) were responsible for his monitoring. At 1109 hours, four minutes after he was placed face-down in the cell, Nurse Chagger and both deputies attempted to communicate with him, but he did not respond. Deputy Tsang-Lee documented well-being checks at 1112, 1138, 1205, 1230, 1307, and 1337 hours, with each "check" lasting only seconds. The deputies did not activate their body-worn cameras, which is apparently a violation of jail procedures.

At 1410 hours (2:10 pm), the two deputies observed Mr. Magana to be unresponsive. His eyes were closed. Deputy Candelario struck the cell door six times, and claimed to see finger movement, but Deputy Tsang-Lee did not. Both deputies left. At 1446 hours (2:46 pm), Tsang-Lee documented another "well-being check," again lasting only seconds. At 1519 hours (3:19 pm), the deputies and nurse Hundal found Mr. Magana face-up (supine), eyes closed, unresponsive, with no visible breathing. Candelario rattled the door, shouted his name, then nudged his foot, finally calling a Code 3 at approximately 1525 hours (3:25 pm). Resuscitation attempts were initiated at 1526 hours. Intranasal Narcan was administered, and the Alameda County Fire Rescue unit arrived on the scene at 1536 hours (3:36 pm), and placed a LUCAS chest compression device. The Falck Alameda County Ambulance was activated via a 911 call, and Paramedic Eugenio Martinez responded. His response record documents that Mr. Magana was completely unresponsive for the entirety of his attendance at the bedside, with a Glasgow coma scale score of 3 (which is the minimal score possible, and is compatible with death), had no spontaneous movement or movement in response to pain, no spontaneous breathing, and was continually asystolic (cardiac "flat line," meaning no heart rhythm whatsoever). Intranasal Narcan had been administered multiple times, with no response whatsoever. In his assessment, Paramedic Martinez wrote that Mr. Magana's skin was "Cold Dry Pale." Mr. Magana's jaw was described as "clenched;" the medical staff in attendance were unable to insert an airway in the mouth or perform bag mask ventilation, due to the jaw being clenched, so a nasopharyngeal airway was inserted and oxygen administered via this tube. In his deposition, Paramedic Martinez confirmed that the jaw was clenched, and he was unable to open the mouth and perform any suctioning, much less ventilate Mr. Magana. The resuscitative attempts were completely unsuccessful, with no return of spontaneous circulation (ROSC), signs of response, and the pupils were dilated and non-responsive. The resuscitative attempts ceased and Mr. Magana was declared to be dead at 1606 hours (4:06 pm). The jail medical staff seemed to believe that Mr. Magana had died of a drug overdose, with no apparent evidence to support that contention, and Paramedic Martinez wrote in his report that the Cardiac Arrest Etiology was "Drug Overdose."

A few hours after Mr. Magana's death, Nurse Chagger inserted a "late entry note" into the chart, which began by describing Mr. Magana's recent history of extremely aggressive behavior and history of attacking "10 staff members in the past month", then wrote that Mr. Magana was brought into Medical in the wheelchair, and was sitting

quietly in his chair. He was described as being able to verbalize his needs, was calm and cooperative with the orders regarding removal of the handcuffs. Once in the cell, she got a verbal order to administer Protonix 40 mg and 2 Gatorade, to watch him for 4 hours in case of projectile vomiting, and that he could be sent back to HU if he was stable. She noted that Mr. Magana would not agree to the medication. She then noted that at or around 1320 hours, she and "MD" (apparently Dr. Mahajan) approached the cell door to evaluate Mr. Magana, and that (somewhat paradoxically) he met them at the cell door with a steady gait; with no injuries, a regular rate of breathing, regular color, and although he still did not agree with the treatment, asked if he could go back to the HU. She then noted that around 0200 (???) she saw that Mr. Magana was laying in his cot, sleeping, with rise and fall of the chest, and the MD was informed that he was resting, with no vomit. The tentative plan was to send Mr. Magana back to HU after the count had cleared.

At about 2038 hours (8:38 pm), Alameda County Coroner's Bureau Investigator Allison Fink arrived at the jail, and examined Mr. Magana's body. She noted in her report that, "Magana was cool to the touch, rigor mortis was minimal and present in the jaw and extremities only. Livor mortis was marked and fixed." An autopsy was performed at the Alameda County Coroner's Bureau on 5/2/2023. The body had been appropriately refrigerated in the interim, and was in excellent preservation as the consequence of being refrigerated during that time interval. The autopsy examination revealed no evidence of any traumatic injuries either externally or internally. The brain examination revealed a normal brain weight (1170 grams), but slight edema with flattening of the gyri, effacement of the sulci, and compression of the cerebral ventricles. The heart, liver, kidneys, lungs, and all other internal organs were completely normal and unremarkable. The stomach contained about 800 ml of watery gray fluid with slight granular sediment.

Evaluation of postmortem blood samples revealed no evidence of illicit drugs, licit drugs, ethanol, or other drugs or medications. Notably, there was no evidence of any fentanyl, or any other opiate or synthetic narcotic that would have caused a respiratory arrest and subsequent cardiac arrest. No "synthetic cannabinoids" were identified. The vitreous fluid was analyzed for electrolyte content, with the following results:

| | | |
|---|---|---|
| Creatinine | 0.617 mg/dl | normal range 0.6-1.3 mg/dl |
| Sodium | 110 mmol/L | normal range 135-150 mmol/L |
| Chloride | 89.2 mmol/L | normal range 106-135 mmol/L |
| Potassium | 19.8 mmol/L | normal range <15 mmol/L |
| Glucose | 23.6 mg/dl | normal range <200 mg/cl |
| BUN | 14.2 mg/dl | normal 8-20 mg/dl |

[Note: The postmortem vitreous Potassium elevation is a complete artifact, with no scientific or medical relevance. After death, the blood erythrocytes (red cells) begin to rupture, and as these cells are rich in Potassium, it will diffuse across the ocular vessels into the fluid which is normally low in Potassium, and the red cell rupture causes the

Potassium to elevate. Postmortem Glucose levels are also uninterpretable, unless the level is extremely high (indicative of hyperglycemia and possible diabetic ketoacidosis). Low vitreous glucose levels have no scientific or medical relevance.]

The vitreous Sodium and Chloride levels were abnormally low; these electrolyte concentrations within the vitreous reliably mirror the electrolyte concentrations within the blood at the time of death. Sodium and Chloride levels are stable within the vitreous fluid. Based upon these levels within the vitreous fluid, and in the complete absence of any other lethal or potentially lethal anatomic or toxicologic findings, the cause of death was ascertained by the Forensic Pathologist as Acute Water Intoxication, with the history (provided to the Coroner's Bureau Investigator) of having consumed approximately 15 glasses of water, with resultant hyponatremia [and hypochloremia], and cerebral edema. I concur with these findings, and agree with the opinion that Mr. Magana's death was caused by Acute Water Intoxication.

Acute water intoxication is uncommon, but not rare, and may occur in a variety of clinical and patient background scenarios. Outside of inadvertent excessive intravenous fluid administration in a medical setting (Emergency Room or Inpatient treatment), the most commonly encountered cause is extremely excessive drinking of fluid, usually water. The adult human kidneys may process and eliminate approximately a maximum of 0.8 to 1.0 L (27 to 33 oz) per hour in the form of urine. However, when an adult human ingests more fluid than what the kidneys are able to process and eliminate per hour, the effect is that the ingested fluid, absorbed into the blood stream and tissues, will dilute the blood. This dilution then causes the body's cells to absorb free water in the blood, as the cellular concentrations of Sodium and Chloride become hypertonic (more electrolyte concentration) with respect to the blood. This cellular absorption of water is through simple passive diffusion across the cellular membranes; where water passes through the cell membranes from a regions of lower to higher electrolyte concentration; no active transport occurs. The cellular absorption of free water from the relatively diluted blood is particularly deleterious in the brain. As the cells throughout the entire brain absorb water, this causes the cells to swell; this occurs throughout the entire brain, ultimately causing outwardly visible swelling of the whole brain (cerebral edema).

Cerebral edema, the swelling of the brain, is clinically evident in distinct, progressive, and ultimately severe alterations in the cognitive (behavioral) abilities of the brain, and also affects consciousness. Initial symptoms of water intoxication and depression of cerebral function are nausea and vomiting, followed by a severe, persistent headache. Muscle cramping will develop, also due to dilution of the myocyte (muscle cell) cytoplasmic electrolyte concentrations, with muscular weakness and spasms. As the brain swells from the dilutional decrease of Sodium and Chloride, confusion, disorientation, and drowsiness are manifest, with disturbances in the person's cognitive (thinking) processes, lapses into semi-consciousness, difficulty in the ability to arouse the person, and then unconsciousness. The person cannot communicate normally, and exhibits confusion and lethargy, with limited to no movement as the lethargy

progresses. When the serum Sodium approaches or reaches 120 mmol/L, the individual lapses into unconsciousness, followed by seizures and respiratory depression, both of which can be lethal. Although the physiologic course of acute water intoxication with the associated electrolyte disturbances is predictable, the time over which this will develop is less so, as the rapidity at which dilutional hyponatremia develops is dependent upon how much water the individual has ingested and thus absorbed. Since the water absorption at the cellular level is by passive diffusion, the more water that is ingested over a short period, the faster the water will be absorbed into the circulatory system, and then the quicker the passive diffusion will cause the intracellular electrolyte disturbances to develop and worsen. Mr. Magana had consumed a massive amount of water by any estimation, and although he did vomit some unmeasurable quantity of water, he did continue to drink large amounts of water after he had vomited. The outward changes in his behavior, consciousness level, lethargy, passivity and quavering voice that he exhibited in the Medical Unit are all recognized symptoms of acute water intoxication, hyponatremia and hypochloremia, and developing cerebral edema with dysfunction of the brain,

According to the observations of the Santa Rita Sheriff's Office jail correctional staff, and at least one member of the medical staff, Mr. Magana was witnessed to have consumed as many as thirty (30), 8 oz (237 ml) cups of water. He may have drank more water prior to being witnessed to drink this massive amount, and the volume contained in 30 cups of water may have actually been greater, as it was unknown if or when he started drinking the water before his behavior was witnessed. For discussion purposes, if he had consumed 30, 8 oz glasses of water, this would be 7.097 L, a massive amount of water (there are 29.57 ml per ounce of water). Mr. Magana was obviously prolifically vomiting in his cell, but it is unknown how much water he had vomited, exactly when he had vomited it in relation to having consumed large quantities of the water he had consumed, and continued to consume even when told to stop (to the point where his cell water was cut off). When Mr. Magana was brought to the Medical Unit for what was eventually a nine minute interaction with Dr. Mahajan that included application of a stethoscope for seconds, he was quiet subdued, lethargic, and apparently cooperative, in contrast to his known violent behavior only a few hours before, when he had reportedly attempted to kick Sgt. Martinez that morning. During his short period in the Medical Unit, he did not exhibit any violent behavior whatsoever. When he was placed in the holding cell for observation, he was clearly passive, not resisting being moved from the wheelchair to the cot, and appearing to comply with all that he was instructed to do, which probably represented profound alterations in his consciousness level and cognition. There, laying on the cot in the otherwise empty cell in the medical bay, he received no other medical treatment, and although there is no evidence that he continued to ingest large amounts of water, he had clearly ingested more than his kidneys could process, causing dilutional hyponatremia and hypochloremia. These alterations continued to progress until he eventually died.

In the context of the known and recognized sign and symptom progression which are associated with dilutional hyponatremia (which is, in and of itself, has more serious

consequences than the accompanying hypochloremia), the “late entry note” written by Nurse Chagger does not make sense. At the time Mr. Magana was seen in the Medical Unit, at 1052 hours (10:52 am), he was clearly suffering from the cognitive alterations caused by the progressive dilution of his blood by the massive quantities of water he had consumed, with resultant ubiquitous brain cellular edema (swelling) from the progressing hyponatremia. Later, reportedly at around 1320 hours (1:20 pm), it is highly improbable that he would have been able to walk, come to the cell door, and interact with the Nurse and doctor in the manner that Nurse Chagger’s “late entry note” describes. As the dilutional hyponatremia develops and progresses, so does the cerebral cellular and whole organ edema, and until the normal electrolyte balance is restored, the symptoms of brain dysfunction are not going to be ameliorated, but instead will predictably increase in severity, with progression to complete unconsciousness, seizures, respiratory depression and death. Nurse Chagger’s “late entry note” belies believability, and describes behavior that is completely improbable, and physiologically impossible in someone suffering from dilutional hyponatremia and the associated cerebral edema that causes depression of consciousness and the usual cognitive functions.

When Paramedic Eugenio Martinez arrived at the jail and evaluated Mr. Magana, he described the body as “cold,” and most importantly, found that the jaw was “clenched” and the mouth could not be opened either for suctioning or for ventilation. Consequently, a nasopharyngeal airway had to be inserted through the nose in order to accomplish ventilation and suctioning. At that time, Mr. Magana was, for all intents and purposes, deceased: he had no cardiac rhythm (“flat line”), exhibited no voluntary movement or response to painful stimuli, the pupils were fixed and dilated, and he exhibited no spontaneous respiratory effort. As he was completely unconscious and completely unresponsive, he would not have been capable of voluntarily “clenching” his jaw, nor is this any known or recognized reflex. Thus, from a medical standpoint, and specifically with the knowledge that he was completely devoid of the unconscious ability to hold his jaw closed (which is NOT within the ability of an unconscious person), this represents the formation of rigor mortis.

After death, the biologic functions of the skeletal muscles cease. Biochemically, muscle function is dependent upon two proteins, actin and myosin, which together within the muscle cellular units form a “ratchet” arrangement with each other, such that movement of a muscle involves the “ratcheting” interaction of many millions of these biochemical units. Adenosine triphosphate (ATP) provides the energy necessary for the actin and myosin protein filaments to interact and “ratchet;” after death, the supply of ATP to the muscle units (and the rest of the body) ceases, and the actin/myosin units stop the biochemical ratcheting, and freeze in place. Externally, this results in evolving and progressive stiffness of the skeletal muscles in the body, which is known and recognized as rigor mortis: The “stiffness” of death. Rigor mortis first begins to be apparent in the jaw and small finger muscles, and at ambient room temperatures, can be discerned by an examiner by approximately 20 to 40 minutes following death. The rigor progresses over the course of hours, gradually involving more and more muscles,

eventually being apparent in the large muscle groups in the body. However, one of the first manifestations of rigor mortis is stiffness of the jaw muscles; if the mouth is closed at the time of death, and not manipulated or forced open, the developing rigor mortis in the masseter muscles will hold the jaw closed, to the point where the jaw cannot even be forced open without excessive and intensive force. Thus, in a person who is found down and has no cardiac activity and is deceased, stiffness in the jaw muscles is a finding that indicates that the person has been dead for an appreciable period of time. As the rigor mortis is initially minimal, but increases with the passage of time, extensive jaw rigor mortis indicates that the person has been dead for a long time, and the inability to open the jaw will be seen if death has occurred an hour or more prior to when the body was found.

Paramedic Martinez also described Mr. Magana's body as "cold." After death, the body begins to radiate off body heat, as the body cools to approach the temperature of the environment. After death, the perception that a body is beginning to cool is apparent at about 20 to 30 minutes, and this coolness progresses even more with the passage of time, until the examiner will feel that the body is "cold." This perception is subjective, but the progression from "cool" to "cold" is reliable. The description of Mr. Magana's body made by Paramedic Martinez is consistent with the death having occurred an hour prior when the body was found, and even longer. At 2:10 pm (1410 hours), deputies Tsang-Lee and Candelario observed Mr. Magana through the cell door, and found him to be completely unresponsive; Deputy Candelario thought that he saw a finger move, which was not seen by Deputy Tsang-Lee, but nothing further was done to evaluate Mr. Magana. The entirety of the medical documentation relative to Mr. Magana after he was found completely unresponsive at 1525 hours indicates that he was actually dead at that time; the profound stiffness of the jaw, and the perception that the body was cold, are all readily consistent with Mr. Magana having been dead for at least an hour, and even longer. In light of this, it is very probable that Mr. Magana was actually dead at 1410 hours, when he was "checked" by the two deputies and was then ascertained to be unresponsive.

In summary, my opinions concerning the death of Jesus Eric Magana are the following:

- Jesus Eric Magana died of Acute Water Intoxication, which is caused by excessive consumption of water over a short period of time, such that the water quantity overwhelms the kidneys' ability to extract water from the circulatory system and form urine. Acute Water Intoxication results in dilution of the blood, such that the concentrations of Sodium and Chloride are gradually reduced, producing severe effects on the brain by causing the brain cells to absorb water, swell, and cause cerebral edema (swelling of the brain). As the brain swells, the physiologic abilities of the brain are impeded, with evolving confusion, drowsiness, disorientation, weakness, inability to walk and function normally, and consciousness depression which progresses to seizure formation and respiratory depression.

- Mr. Magana was witnessed by Santa Rita jail personnel, and an assigned Nurse, to consume extraordinary quantities of water, to the extent that they even discussed the serious consequences of this, up to and including death. He had vomited in his cell, but it is impossible to even begin to estimate how much water he had vomited, as compared to the quantity of water he had ingested. However, after he was taken to the Medical Unit for evaluation, it does not appear that the possibility of acute water intoxication was broached, or ever discussed again.

- When Mr. Magana was evaluated in the Medical Unit, he was lethargic, poorly communicative, sat in a wheelchair, spoke very quietly, and acted distinctly abnormal, in direct contrast to his known violent behavior tendencies. Earlier that same morning, before he began to drink extremely large amounts of water, he purportedly attempted to kick one of the correctional officers.

- The physical examination of Mr. Magana in the Medical Unit was incredibly cursory, and minimal by any standard of medical practice. He was diagnosed with acute gastritis, and was to begin treatment with an anti-nausea drug, and also prescribed Gatorade. At this point, he was distinctly severely fluid overloaded, and the prescription to increase his fluid intake was completely erroneous.

- Mr. Magana was placed within an observation cell, and ostensibly checked over the next approximate 2 ½ hours. The officers tasked with checking him did not have their body cameras activated.

- At 1410 hours, about 3 hours after he was evaluated in the Medical Unit, Deputies Tsang-Lee and Candelario "checked" on Mr. Magana, without entering the cell. Mr. Magana appeared unresponsive, and did not respond to banging on the cell door. Deputy Candelario thought that he saw a finger move; Deputy Tsang-Lee did not.

- At 1519 hours, Mr. Magana was found to be completely unresponsive, and a Code 3 was called at 1325 hours. At that time, and immediately subsequently, he exhibited no signs of life, was completely unresponsive, had no heart rhythm, did not respond to pain, made no breathing movements, or any parameter which indicated anything other than he was dead at that point.

- When Paramedic Eugenio Martinez arrived and evaluated Mr. Magana, he found that the jaw was "clenched" and could not be opened, and that the body was cold. These alterations are typical and characteristic findings in the body of an individual who has been dead for at least an hour, and quite probably longer. In light of this, it is my opinion, to a reasonable degree of medical certainty, that at 1410 hours, Mr. Magana was, in fact, already dead, and as the examining deputies did not carry out any evaluations other than looking at Mr. Magana

through the cell door, no further direct evaluation of his physical status, and even if he was alive or dead, could be performed.

- A "late entry note" written by Nurse Chagger, several hours after Mr. Magana had been declared dead, describes physical and cognitive behaviors at about 1320 hours that would have been physiologically impossible for an individual who was experiencing progressive cerebral edema from acute dilutional hyponatremia (acute water intoxication). The purported behavior and actions exhibited by Mr. Magana at that time make no sense in the context of the deleterious, dangerous, and debilitating acute consequences of acute water intoxication, and question the accuracy and believability of this note. Left untreated, acute water intoxication slowly progresses as the brain swells, with concomitant swelling of the brain, which eventually evolves to unconsciousness, seizures, and death.

- The autopsy of Jesus Eric Magana diagnosed Acute Water Intoxication, with resultant hyponatremia, hypochloremia, and cerebral edema, the classic findings in dilutional hyponatremia. I concur with the findings of the autopsy examination.

All of the above opinions are rendered to a reasonable degree of medical certainty.

Kris Sperry, M. D.