# EXHIBIT J

*Estate of Magana v. County of Alameda*
Case No. 3:24-cv-04716-JD (N.D. Cal.)



# Expert Report

**Michael T. Puerini, MD, CCHP-A, FACCP**
*Correctional Medicine Expert and Consultant*
Email ssnag@yahoo.com
Telephone 503-551-7473

## Introduction:

I was asked by Mr. Mark Merin, with law offices in Sacramento California, to review the care provided to Mr. Jesus Eric Magana (DOB 12/16/1996), who died while in custody at the Alemeda (California) County Jail on April 27, 2023.

This report serves as a brief summary of Mr. Magana's care and my preliminary opinions subsequent to my initial review of the case.

## 1. Qualifications

I am a correctional physician specialist, having spent over twenty-five years of my career practicing medicine in both juvenile and adult correctional facilities. Over the course of my career, I have worked with, and directly or indirectly supervised and taught registered nurses (RNs), licensed practical nurses (LPNs), mid-level practitioners (nurse practitioners and physician assistants), and primary care physicians both in correctional settings and in the community.

I am a medical school graduate of the Creighton University School of Medicine, having graduated in 1984. I completed my Internship and Residency in Family Medicine in 1987 at Brown University-Memorial Hospital of Rhode Island, where I was chief resident in my final year. I am a physician licensed to practice medicine in the State of Oregon and am Board-eligible in Family Medicine.

I am an Advanced Certified Correctional Health Professional (CCHP-A), one of approximately fifty individuals so certified. I am the Past President of the American Academy of Correctional Physicians ("ACCP"), a national medical organization. I have served on the Board of Directors of the ACCP from 2005 until 2015, and I have been the Chair of the Policy and Practice Steering Committee. I continue to serve on the education committee and as chair and founder of the virtual education committee. In the latter role, I help plan and implement regular educational sessions for correctional medicine healthcare providers.

I was recently awarded the highest honor in correctional medicine by the American College of Correctional Physicians, the Armond Start Award.

I teach correctional health care principles, including practice standards related to the practice of physicians, to national and regional audiences of physicians, mid-level practitioners, nurses, and other health care professionals.

I had been the Chief Medical Officer of the Oregon State Correctional Institution ("OSCI") since 1998, until my retirement in May, 2016. I also served on the Nursing Protocol Committee, performed all mortality reviews for the Oregon Department of Corrections ("ODOC"), and acted as the Assistant to the Medical Director.

After retiring from my full-time position, I returned to work for the ODOC, performing most of my prior responsibilities on a part-time basis. I was the director of physician education for the ODOC, planning a regional medical education program twice yearly. I assisted in planning national and regional programs of education for physicians working in correctional settings. I have practiced primary care medicine in a correctional institution setting since 1992. In January, 2022, my work relationship with the ODOC ended after over 25 years of service. The clinical practice of medicine in correctional institutions remains my primary professional focus.

I have investigated, monitored, and evaluated the safety and appropriateness of health care delivery in correctional institutions in my role as physician accreditation surveyor for the National Commission on Correctional Health Care ("NCCHC"), as an administrator at the ODOC, and in my current role as technical consultant for the Wyoming Department of Corrections and the Philadelphia Department of Prisons.

Additional details of my credentials to evaluate and offer opinions in this case can be found in my attached Curriculum Vitae.

## 2. Testimonial Information, Fees, and History

I review cases and act as an expert witness in select cases, and have been deposed as an expert witness approximately ten times since 2deo014. I have never testified at trial. We will likely accrue approximately $5,000 in fees for this project up to the time of this report.

## 3. Documents Reviewed

In preparation for giving my expert opinions in this case, I have received and reviewed the following documents, which I considered in forming my opinions:

- MEDICAL RECORDS CFMG 000001 – 000782
- First Amended Complaint filed
- CFMG 001381-001449 - Mahajan, Rajendra Credentialing File
- CFMG 001450-001505 - Mahajan, Rajendra Employee File Redacted
- CFMG 001506 - Training logs - Hundal, Mahajan, Chagger
- COUNTY000001-COUNTY000031 Report_Redacted
- COUNTY000032 Crime Lab Report 23-006030
- COUNTY000121-COUNTY000134 Autopsy_Redacted
- COUNTY000191 Candelario_Tsanglee_welfare_check_of_Magana

- COUNTY000195 Eric_Magana_Medical_Assist-2
- COUNTY000197 MAGANA,_ERIC_BMD654 video
- COUNTY000198 MAGANA,_ERIC_BMD654-3 video
- COUNTY000199 Medical_Emergency_Magana_(BMD654)
- COUNTY000200 Medical_Emergency_Magana_(BMD654)-2 video
- COUNTY000201 Medical_Emergency_Magana_(BMD654)-3 video
- COUNTY000202 Medical_Emergency_Magana_(BMD654)-4 video
- COUNTY000204 OPHU_Inmate_Eric_Magana video
- COUNTY000920_CONFIDENTIAL-COUNTY000933_CONFIDENTIAL 2023-032
- COUNTY000934_CONFIDENTIAL-COUNTY000946_CONFIDENTIAL 2023-033
- COUNTY000947_CONFIDENTIAL-COUNTY000985_CONFIDENTIAL MAGNA ERIC REQ'D 10-24-25

I reserve the right to amend my report as additional discovery information is provided, as requested.

## 4. Methodology

It is critical to note that I am a consultant. As such have never met nor cared for Mr. Magana, much less examined him. I give opinions in the case based on my medical review of the record, tempered by my extensive experience in the correctional milieu. Any observations or suggestions provided are solely based on my clinical experience and record review.

This is primarily a clinical/legal review. It is not substantially different from medical reviews that I conduct in my role as a consultant to jurisdictions that request my review and comments on cases unrelated to legal action and the internal quality assurance reviews that I would perform when reviewing the care provided at correctional facilities at which I served as a medical director. Whether in practice or as a consultant, such a review involves reviewing the materials presented which allow me to understand (as best as possible) the patient history and care rendered (or not rendered), conducting research on medical and correctional standards when needed from national sources, and formulating opinions based on the facts of the case and my knowledge and experience. I conduct reviews independently and impartially; my opinions are based on medical standards and facts. The opinions and conclusions expressed in this report are entirely my own.

## 5. Timeline and Summary of Facts

The 26-year-old decedent Jesus Eric Magana had an established, documented history of schizophrenia at the time of his arrest.

On March 28, 2023, Mr. Magana was arrested and booked as a pre-trial detainee into the Santa Rita Jail in Dublin, California. Mr. Magana was identified by jail staff as a Behavioral Health Inmate (BHI) and classified for housing in Step 1 of the Restrictive Housing Unit (RHU).

On April 26, 2023, Mr. Magana was observed to be ill inside of his cell. Mr. Magana's cell was littered with trash on the floor and desk. Around 4:47 p.m., deputy sheriff Zachary Gilkerson

ordered Mr. Magana to pick-up and throw-away the trash in his cell. Mr. Magana reportedly "refused."

On April 27, 2023, around 10:12 a.m., deputy sheriff Erik Baker was informed by an inmate that Mr. Magana was "projectile vomiting" inside of his cell. Deputy Baker approached Mr. Magana's cell and reportedly observed that the "cell floor was covered in a wet substance" which "appeared to be vomit" and that Mr. Magana wore "no shoes on his feet and the bottom of his pants were wet." Deputy Baker asked Mr. Magana if he was "ok and if he was feeling well." Mr. Magana "shook his head side to side in a 'no' gesture." Deputy Baker and asked Mr. Magana "if he had been throwing up" and Mr. Magana responded by "nodding his head ['yes']" Deputy Baker told Mr. Magana that he "would contact a nurse to check on him" but he did not do so.

Around 10:35 a.m., deputy Baker reportedly observed Mr. Magana "projectile vomiting" inside of his cell. Deputy Baker again told Mr. Magana that he "would contact a nurse." Deputy Baker did not immediately do so.

Around 10:38 a.m., deputy Baker called deputy Gilkerson, told him that he observed Mr. Magana "projectile vomiting" inside of his cell, and asked him to come to the cell. Deputy Gilkerson responded to the cell and observed that the floor and toilet of the cell was "covered in a clear liquid" and the cell remained littered with trash. Deputy Gilkerson notified his supervisor, sergeant Luis Martinez.

Around 10:40 a.m., sergeant Martinez responded to Mr. Magana's cell. Sergeant Martinez and deputy Gilkerson watched as Mr. Magana "continuously" drank "copious amounts of water while vomiting," including about 15-to-20 cups of water from the sink inside of his cell. Deputy Gilkerson reported that it was possible Mr. Magana drank even more water than he observed because he was "unsure how much water [Mr. Magana] drank prior to this moment." Sergeant Martinez observed a "copious amount of water mixed [] with what [he] believed to be vomit" on the floor of Mr. Magana's cell including "vomit in and around [the cell's] toilet." Sergeant Martinez asked Mr. Magana "how he was doing and what was going on" and Mr. Magana "said he was throwing up." Sergeant Martinez observed that Mr. Magana's clothes were wet and "soiled from his vomit."

Nurse (RN) Par Kaur arrived at Mr. Magana's cell. Sergeant Martinez informed nurse Kaur that Mr. Magana "had been projectile vomiting." Mr. Magana continued drinking water from the sink in his cell using a cup. Deputy Gilkerson ordered Mr. Magana to "Stop drinking so much water!" but Mr. Magana "did not comply." Sergeant Martinez asked Mr. Magana "What's going on?" but Mr. Magana "did not respond." Sergeant Martinez asked whether Mr. Magana "was purposefully drinking water" and deputy Gilkerson responded, "He is doing that consistently until he throws up." Sergeant Martinez stated his concern to nurse Kaur that "a person could 'actually die' from drinking too much water." Nurse Kaur looked inside Mr. Magana's cell and "noticed the vomit on the floor and [Mr. Magana] drinking water" and observed Mr. Magana rapidly drink 15-to-20 8-ounce cups of water. Nurse Kaur asked Mr. Magana if he was "ok" but Mr. Magana did not respond. Sergeant Martinez stated, "We gotta get him out of there. He has to stop drinking all that water." Nurse Kaur responded, "I know." Mr. Magana "continued drinking water." Sergeant Martinez ordered that the water supply inside of the cell be shut-off. Deputy Gilkerson walked to

the control tower and a technician turned-off the water supply in the cell. Mr. Magana changed into clean and dry clothing. Sergeant Martinez advised nurse Kaur that Mr. Magana should be housed in the Outpatient Housing Unit (OPHU) where he could be medically observed by a doctor. Nurse Kaur agreed and asked the custody staff to transport Mr. Magana to the OPHU.

Around 10:45 a.m., custody staff applied restraints to Mr. Magana's arms, waist, and legs and secured him in a wheelchair. Around 10:50 a.m., sergeant Martinez and deputy sheriffs Christopher Krol, Shaun Williams, and Gilkerson transported Mr. Magana by wheelchair to the OPHU. At the OPHU, Mr. Magana's "body began shaking as if he was cold." Nurse Kaur telephoned physician (MD) Rajendra Mahajan and informed him that Mr. Magana "had been projectile vomiting in his cell."

Around 10:52 a.m., Dr. Mahajan arrived. Dr. Mahajan's examination of Mr. Magana lasted approximately four minutes. The following is a transcription of the conversation captured on recordings of the exam:

- 17:52:05 (10:52:05 AM) Dr. Mahajan enters the room; nurse Kaur said, "Hi, Doc."
- 17:52:10 (10:52:10 AM) Dr. Mahajan said, "Who do I need to see?"
- 17:52:17 (10:52:17 AM) Nurse Kaur said, "So, his name is Magana, Eric. So, so he had a vomit all over in his room but he was forcefully drinking water, like, at least 15 to 20 glasses. I saw him. So, he didn't say anything over there. So, this is just a blood pressure I just checked."
- 17:52:26 (10:52:26 AM) Dr. Mahajan said, "Bring him here."
- 17:52:36 (10:52:36 AM) Deputy said, "Be careful because he's very assaulted. He's very assaultive."
- 17:52:41 (10:52:41 AM) Dr. Mahajan said, "Man, I'm here to help you out, okay? Be quiet, Be calm, ok?"
- 17:52:43 (10:52:43 AM) Dr. Mahajan said, "So, tell me what happened. It started this morning?" Mr. Magana did not respond.
- 17:52:51 (10:52:51 AM) Dr. Mahajan said, "What do you ... Did you eat anything and then it started?"
- 17:52:52 (10:52:52 AM) Sergeant Martinez said, "¿Comistes algo?" [English: "Did you eat something?"]. Mr. Magana did not respond.
- 17:52:55 (10:52:52 AM) Sergeant Martinez said, "Huh? Comistes algo?" [English: "Did you eat something?"]. Mr. Magana said, "No, todo está bien" [English: "No, everything is ok"].
- 17:52:56 (10:52:56 AM) Sergeant Martinez said, "Huh, comiste?" [Translation: "What did you eat?]
- 17:53:00 (10:53:00 AM) Mr. Magana said, "Avena" [English: "oatmeal"].
- 17:53:04 (10:53:04 AM) Dr. Mahajan asked for Mr. Magana's blood pressure readings.
- 17:53:07 (10:53:07 AM) Sergeant Martinez said, "He is saying he had oat -- I'm sorry."
- 17:53:10 (10:53:10 AM) Dr. Mahajan said, "What happened now? How many times you saw him vomit? You saw him once?"

- 17:53:13 (17:53:13 AM) Nurse Kaur said, "Deputy Baker saw him and he was projectile vomiting but when I saw him in the room on the toilet, everything is a vomit. Water on the floor."
- 17:53:22 (10:53:22 AM) Dr. Mahajan said, "He has a history of any drugs? Do you take any drugs, like alcohol or anything?"
- 17:53:26 (10:53:26 AM) Mr. Magana said, "No."
- 17:53:27 (10:53:27 AM) Dr. Mahajan said, "No?"
- 17:53:28 (10:53:28 AM) Mr. Magana said, "No," then spoke in Spanish.
- 17:53:30 (10:53:30 AM) Sergeant Martinez said, "Huh? Tomè medicina" [English: "Do you take medicine?"].
- 17:53:32 (10:53:32 AM) Mr. Magana said, "No."
- 17:53:33 (10:53:33 AM) Deputy said, "Ok. Drogas?" [English: "Ok. Drugs?"].
- 17:53:34 (10:53:34 AM) Mr. Magana said, "No." Sergeant Martinez said, "No."
- 17:53:46 (10:53:46 AM) Dr. Mahajan asked for Mr. Magana's "medication and past medical history."
- 17:53:54 (10:53:54 AM) Dr. Mahajan held a stethoscope on Mr. Magana's chest for about 30 seconds
- 17:53:57 Dr. Mahajan said, "Breathe."
- 17:54:20 (10:54:20 AM) Dr. Mahajan said, "Does it pain now? Dolor?" [English: "Pain?"].
- 17:54:23 (10:54:23 AM) Mr. Magana said, "No." Dr. Mahajan said, "No?"
- 17:54:26 (10:54:26 AM) Dr. Mahajan said, "Nauseating? Vomiting?"
- 17:54:31 (10:54:31 AM) Mr. Magana mumbled.
- 17:54:38 (10:54:38 AM) Dr. Mahajan said, "Any other problem?" Mr. Magana said, "No."
- 17:55:02 (10:55:02 AM) Dr. Mahajan said, "How many times did you vomit?"
- 17:55:04 (10:55:04 AM) Mr. Magana said, "I don't know, like, five?"
- 17:55:07 (10:55:07 AM) Dr. Mahajan said, "It was after eating something or -- you just woke up with it?"
- 17:55:14 (10:55:14 AM) Mr. Magana said, "I don't know. I'm just too weak but I woke up fine."
- 17:56:05 (10:56:05 AM) Dr. Mahajan said, "How old are you?"
- 17:56:06 (10:56:06 AM) Mr. Magana said, "26."
- 17:56:12 (10:56:12 AM) Dr. Mahajan said, "I think I saw you there."
- 17:56:13 (10:56:13 AM) Nurse Kaur answered about stitches around Mr. Magana's eyebrow.
- 17:56:54 (10:56:45 AM) Dr. Mahajan lefted the room.

Dr. Mahajan did not comment or inquire about Mr. Magana's water ingestion. In Mr. Magana's medical records, Dr. Mahajan, M.D. entered the following medical notes:

> 04-27-2023 12:31 pm Rajendra P Mahajan
>
> Requested by Patient: Yes

> Subjective: 04-27-2023 12:31 pm - Mahajan, Rajendra : OPHU MD SHORT NOTE : 27 yus old male booked 3/28/23 and hosed in HU #1 with hx of severe psychiatric history and violent aggressive and impulsive with hx of attacking deputy , was seen to be vomiting all over cell and was brought to trauma room when seen he was awake alert oriented x3 (spanish speaking) in wheel chair vitals normal not in any distress or discomfort was non toxic sitting quietly in chair with hand cuffed on asking said had 5 projectile vomitings since am to day denied eating new food or left overs no blood in vomiting and no abd pain or tenderness and denied any diarrhea sob cough chest pain fever chills ha dizziness
>
> Objective: 04-27-2023 12:31 pm - Mahajan, Rajendra : vitals normal BP 133/96 rr 16 temp 98.7 hr 96 and pulse ox 98 % has no distress breathing quietly awake alert orientedx3 HEENT : Head AT NV . eyes PERRLA , normal eom no focal facial sensory motor loss no nasal or ear bleeding/discharge no icterus CVS tachycardia rest unremarkable RS; CTA abdomen : soft NT ND BS normal no mass or guarding Beuro normal by observation no focal deficits noted psych : quiet at present but hx of psychosis
>
> Assessment: 04-27-2023 12:31 pm - Mahajan, Rajendra : 1) acute gastritis with vomiting 2) severe mental health issues 3) high safety risk
>
> Plan: 04-27-2023 12:31 pm - Mahajan, Rajendra : 1) IM Zofran 4 mg given 2) Advised to take gatorade 3 time /day keep hydrated 3) patient refused protonix /mylanta 4) will observe for 4 hrs in OPHU and if stable will transfer him back to HU
>
> Off Education: 04-27-2023 12:31 pm - Mahajan, Rajendra : cooperate keep calm drink fluids

Around 11:05 a.m., Mr. Magana was housed in the OPHU medical observation cell, OPHU-WEST-11, “for a four-hour medical observation due to [his] being nauseous.” Mr. Magana was “placed on the bed face down” in the cell and the restraints were removed from his arms, waist, and legs. Deputy sheriffs Zachary Tsang-Lee and Peter Candelario and nurses (RN) Sumeet Chagger and Harkamaljit Hundal were responsible for monitoring and supervising Mr. Magana in the OPHU.

At about 11:09 a.m., nurse Chagger and deputies Tsang-Lee and Candelario attempted to speak with Mr. Magana but he did not respond.

Around 11:12 a.m., deputy Tsang-Lee reported conducting a “Well-Being Check Inmate and Cell” on Mr. Magana in his cell which lasted no more than seconds.

Around 11:38 a.m., deputy Tsang-Lee reported conducting a “Well-Being Check Inmate and Cell” on Mr. Magana in his cell which lasted no more than seconds.

Around 12:05 p.m., deputy Tsang-Lee reported conducting a "Well-Being Check Inmate and Cell" on Mr. Magana in his cell which lasted no more than seconds.

Around 12:30 p.m., deputy Tsang-Lee reported conducting a "Well-Being Check Inmate and Cell" on Mr. Magana in his cell which lasted no more than seconds.

Around 1:07 p.m., deputy Tsang-Lee reported conducting a "Well-Being Check Inmate and Cell" on Mr. Magana in his cell which lasted no more than seconds.

Around 1:37 p.m., deputy Tsang-Lee reported conducting a "Well-Being Check Inmate and Cell" on Mr. Magana in his cell which lasted no more than seconds.

Around 2:10 p.m., deputy Tsang-Lee observed Mr. Magana unresponsive in his cell. Deputy Tsang-Lee requested deputy Candelario to come to Mr. Magana's cell and observe him. Deputy Candelario observed Mr. Magana through a window in the cell door. Deputy Candelario kicked the cell door three times in attempt to elicit a response from Mr. Magana but he remained unresponsive. Deputy Candelario said, "Yeah, his fingers are moving. Yeah, look. You can see his fingers moving." Deputy Tsang-Lee looked through the cell door window. Deputy Candelario said, "The ones that's by his chin." Deputy Tsang-Lee watched Mr. Magana for about 25 seconds, without responding. Deputy Candelario said, "You don't see them?" Deputy Tsang-Lee said, "No." Deputy Candelario looked into the cell, kicked the cell door three more times, and observed that Mr. Magana remained unresponsive. Deputy Candelario watched Mr. Magana for about one minute and 30 seconds, without responding. Deputy Candelario said, "Yeah, he is moving. I can see his fingers moving." Deputies Tsang-Lee and Candelario walked away from the cell.

Around 2:46 p.m., deputy Tsang-Lee reported conducting a "Well-Being Check Inmate and Cell" on Mr. Magana in his cell which lasted no more than seconds.

At about 3:19 p.m., deputies Tsang-Lee and Candelario and nurse Hundal reported conducting a safety check within the OPHU. Deputies Tsang-Lee and Candelario reported observing Mr. Magana inside of his cell, lying face-up on a mattress with his eyes closed, "unresponsive," and without "any signs of life" such as "respiratory activity" or a rise-and-fall of the chest. Deputy Candelario reported that he "rattled" the cell door of Mr. Magana's cell but he did not move or respond, and that he "shouted" Mr. Magana's name and "nudged his left foot" but he did not respond. Deputy Candelario used his radio to request a "Code 3" emergency medical response to the cell.

Around 3:26 p.m., medical personnel, including Dr. Mahajan and multiple nurses, reportedly responded and began life-saving measures on Mr. Magana. Narcan was reportedly administered into Mr. Magana's nasal passage.

Around 3:36 p.m., personnel from the Alameda County Fire Department arrived on-scene and took-over the application of life-saving measures to Mr. Magana. The fire department personnel utilized a Lund University Cardiopulmonary Assist System (LUCAS) device which is a

mechanical chest compression machine that autonomously performs cardiopulmonary resuscitation (CPR) on subjects to which the device is applied.

Around 4:06 p.m., medical personnel discontinued life-saving measures and Mr. Magana was pronounced deceased.

Mr. Magana's autopsy and coroner investigator's report "determined the cause of death to be acute water intoxication," and the toxicology report "did not show any common controlled substances in his blood."

**6. EXPERT OPINIONS**

1. Mr. Magana was not convicted of any crime.

2. Inmates are human beings unable to care for their own medical needs. They can only seek care from medical providers in the building where they are housed.

3. Sometimes inmates, because they are seriously mentally ill, are not able to request medical assistance, as happened in this case.

4. Mr. Magana was admitted to the Almeda County facility "disheveled, dirty", and seemingly unable to care for his own basic needs.

5. Mr. Magana's primary language was Spanish. Little translator activity occurred, as documented. As such, he particularly was unable to request help.

6. Translation services, when documented on video during the single physician diagnostic visit, was carried out peremptorily by a correctional officer, removing the possibility of patient confidentiality and accurate translation during.

7. One of his ways of asking for help was seemingly through his violent behavior in the days prior to his collapse.

8. When seriously mentally ill patients with know schizophrenic symptoms become violent, this change in mental status often reflects a physical illness. This possibility was neglected and was never medically considered, and clearly should have been.

9. When a patient is seriously mentally ill, diagnosed with psychotic symptoms and schizoaffective disorder, as the history clearly shows in the Almeda County medical record in this case, they require mental health attention, including psychiatric care and medication.

10. Instead of this, patient was placed in segregation. No significant mental health care occurred. No significant monitoring of Mr. Magana, as required by the standard of care, occurred while he was in segregation.

11. On 2/2/23, the only documented mental health visit during 2023 occurred, which documented that Mr. Magana was demonstrating “psychotic symptoms”, “interested in meds”, with SMI, and at “high risk”.

12. No significant mental health care is documented after that visit, or during his incarceration beginning on 3/28/2023, until his death.

13. At intake, minimal care dictates that previously documented essential healthcare information about serious medical conditions are carried forward in continuity of care.

14. This did not occur, much to Mr. Magana’s detriment. This was additional evidence of deliberate indifference, by intentionally ignoring the prior very serious history.

15. On video, on the morning of his death, Mr. Magana is seen to be rapidly ingesting at least 15 glasses of water in under 3 minutes. Officers reported “projectile vomiting”, his cell floor is seen on video to be covered with watery fluid.

16. The nurse reported Mr. Magana’s amazingly excessive and clearly dangerous water drinking to the physician (as seen and heard on video), and referred him the doctor on-site.

17. The on-site physician seemingly ignored the symptoms of excessive water ingestion, the serious mental illness, and the imminent danger to his patient.

18. In my opinion, on a more likely than not basis, based on standards of decency and minimal care, the physician in question was deliberately indifferent to the needs of his patient, Mr. Magana.

19. Zofran, a medication to prevent vomiting, was prescribed by the physician. No additional monitoring, diagnostic testing, or treatment was prescribed.

20. The physician clearly knew that his patient was ill and provided essentially no care.

21. During all videos reviewed, Mr. Magana demonstrated absolutely no evidence of violent behavior. In fact, his demeanor supports altered mental status, clouding of consciousness, and disorientation.

22. At no time in the video is the physician seem to attempt a mental status evaluation. Dr. Mahajan does he document “oriented x 3”, although I am not clear as to when this might have happened, bringing the physician’s documentation into question.

23. At this point in the timeline, it is my opinion that Mr. Magana’s medical condition required emergency care outside of the facility for further evaluation. This level of care

was clearly needed and not delivered. Mr. Magana at this point was in clear physical danger.

24. In the absence of hospital level care, at the absolute minimum, Mr. Magana required infirmary level care on the morning of his death, with active monitoring, blood work, and periodic vital signs needed. No infirmary level care was delivered at the Almeda County on the day of Mr. Magana's death.

25. The care Mr. Magan was delivered, essentially segregation in a "medical housing unit" with no active medical monitoring or treatment, was essentially a death sentence.

26. His only monitoring consisted of two brief visits at the cell door, one by the physician and nurse in which his gait is documented as normal and he reports he needs nothing.

27. During the second visit, the nurse noted Magana to be breathing. No active monitoring occurred.

28. In the absence of this care, the eventual outcome, death within 5-6 hours, was a predictable outcome.

29. A nursing note at 1708 (long after Mr. Magana is pronounced dead at 1602) notes that the custody officer found Mr. Magana unresponsive at 1525. Video evidence support that officers and health care staff were very aware of Mr. Magana's unresponsive state at least seven minutes prior to that. No medical evaluation was called for or carried out, despite Mr. Magana's being held in a medical housing unit bed.

30. Mr. Magana was found to be continuously unresponsive at least by 1525 on the day of his death. It is certainly possible that he was unresponsive when the nurse at the cell door found him to be breathing but not responding at approximately 1400.

31. Video evidence supports that healthcare and custody staff were aware that Mr. Magana was not responsive, nor seen to be breathing, for no less than seven minutes at the cell door before entering the cell.

32. Emergency measures began soon after healthcare staff entered the cell, at approximately 1528. The nurse's note at 1708 documents that Magana was found to be unresponsive at 1525. This is patently false based on video evidence of the seven-minute delay.

33. An IV was started at approximately 1538. This is evidence that the patient's life could potentially have been saved had the emergency response been appropriate.

34. We cannot ascertain how long the patient was in full cardiovascular arrest before finally deciding that it was safe to enter the cell. It is well known that in circumstances like this, time is of the essence. A five-minute delay means death.

35. It is totally irresponsible for custody and healthcare staff members to wait seven minutes before entering the cell of an unresponsive patient who is not breathing. This could potentially amount to criminal behavior on the part of these staff members, and almost certainly amounts to deliberate indifference.

36. In a correctional institution, in a medical housing unit, the safety of an unresponsive patient who is not breathing should have superseded the supposed danger to the staff.

37. As it is, when the cell was finally entered, Mr. Magana was found to be pulseless and in full cardiovascular arrest. Emergency efforts then were initiated, too late for them to be able to save Mr. Magana's life.

38. Despite the fact that the emergency response was deplorable, the nurse documents in her note at 1708 that the emergency response was immediate and that Mr. Magana was found unresponsive at 1525. Both statements documented in the nursing note are false.

39. Large sums of money are exchanged to provide care which is constitutionally mandated. Despite these millions of dollars being paid to the contracted healthcare corporation, essentially no medical care was delivered to Mr. Magana on the date of his death despite his predictable poor outcome (death).

40. Constitutionally mandated care must happen once a patient is incarcerated regardless of the crime committed (in this case, no crime was proven), the custody status, or the potential danger to correctional officers or healthcare staff.

41. If, at any point from the nursing observation of Mr. Magana drinking 15 glasses of water in under three minutes, until he was found to be unresponsive approximately four hours later, any single staff member of Wellpath or the Almeda County Jail had shown some care and compassion for him, he would more likely than not have survived water intoxication.

42. Furthermore, more likely than not, had the emergency response to a patient known to be unresponsive, been appropriately evaluated immediately, as called for by human decency and fundamental standards of care, Mr. Magana would more likely than not have survived water intoxication.

43. Furthermore, had the emergency response been appropriate, without staff standing for seven minutes at the cell door, observing a patient who was seemingly not breathing, Mr. Magana would more likely than not have survived water intoxication.

44. Given the condition of Mr. Magana's cell, there is substantial evidence that he had ingested far more water in the time before he was observed, multiplying the risk.

45. As a primary care physician, Dr. Mahajan knew or should have known that Mr. Magana was seriously mentally ill. He knew or should have known the immediate danger of his

patient drinking at least fifteen glasses of water in under three minutes. Immediate evaluation of this was clearly called for and never done, reflecting deliberate indifference.

46. It is well established that the Santa Rita/Almeda County Jail is not a safe place based on studies and court actions, particularly for SMI. It is clear that court efforts have met with no success based on the abysmal lack of care delivered to Mr. Magana in 2023.

47. My opinion is that custody and medical staff were far more worried about the danger of an apparently cooperative patient than that patient's safety.

The opinions contained in this report are based upon my understanding of the facts of the case after a brief review of some of the information provided. This is by no means a report to be shared publicly, as agreed upon with the legal representatives who requested the review.

The report is further informed by my education, training, and experience in the field of primary care medicine and correctional healthcare. All of the opinions and conclusions stated herein are given to a reasonable degree of medical certainty.

I reserve the right to amend or alter these opinions or to add any needed additional exhibits should further facts illuminate a need to do so, especially after any further investigation or more thorough review of the materials.

I declare under penalty of perjury of the laws of the state of Oregon that the foregoing is true and correct and that this declaration was executed on July 1, 2026, at Portland Oregon.

Dated: June 28, 2026

Sincerely,

*/s/ Michael T. Puerini, MD, CCHP-A, FACCP*

Michael T. Puerini, MD, CCHP-A, FACCP